Pilar C. French, OSB No. 962880
frenchp@ballardspahr.com
**BALLARD SPAHR LLP**
601 S.W. Second Avenue, Suite 2100
Portland, Oregon 97204
Telephone: 503.778.2100
Facsimile: 503.778.2200

Burt M. Rublin, *Admitted Pro Hac Vice*
rublin@ballardspahr.com
Alan S. Kaplinsky, *Pro Hac Vice Forthcoming*
kaplinsky@ballardspahr.com
Facundo Bouzat, *Admitted Pro Hac Vice*
bouzatf@ballardspahr.com
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: 215.665.8500
Facsimile: 215.864.8999

Attorneys for Plaintiffs National Association of Industrial Bankers, Online Lenders Alliance, and American Financial Services Association

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, ONLINE LENDERS ALLIANCE, and AMERICAN FINANCIAL SERVICES ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>SEAN O'DAY, in his official capacity as Director of Oregon Department of Consumer and Business Services,<br><br>Defendant. | Case No. 6:26-cv-01201-AA<br><br>PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF LAW<br><br>ORAL ARGUMENT REQUESTED |

# TABLE OF CONTENTS

Page


I. LOCAL RULE 7-1 CERTIFICATION .......... 1

II. MOTION .......... 1

III. MEMORANDUM OF POINTS AND AUTHORITIES .......... 3

A. Introduction. .......... 3

IV. ARGUMENT .......... 5

A. NAIB, OLA, and AFSA Have Associational Standing. .......... 5

B. Oregon's Opt-Out. .......... 7

C. The National Bank Act and Marquette. .......... 9

D. DIDMCA .......... 10

1. Section 521 of DIDMCA. .......... 10

2. Section 525 of DIDMCA. .......... 12

E. Section 1, Subsection 3 of House Bill 4116 is Preempted by Section 521 of DIDMCA .......... 13

F. Section 1, Subsection 3(b) of House Bill 4116 Also Violates the Dormant Commerce Clause. .......... 23

G. Plaintiffs Are Entitled to a Preliminary Injunction Preventing Enforcement of Section 1, Subsection 3 of House Bill 4116 Against Out-of-State State Banks. .......... 25

V. CONCLUSION .......... 32




**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

## TABLE OF AUTHORITIES

**Federal Cases** **Page(s)**

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
729 F.3d 937 (9th Cir. 2013) ....................31

*Ass'n for Accessible Meds. v. Bonta*, 562 F.Supp.3d 973 (E.D. Cal. 2021) ....................4, 29

*Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*,
159 F.3d 1178 (9th Cir. 1998) ....................6

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ....................4, 26

*Bare v. Barr*,
975 F.3d 952 (9th Cir. 2020) ....................18

*Cal. Pharmacists Ass'n v. Maxwell-Jolly*,
563 F.3d 847 (9th Cir. 2009) ....................29

*Cal. Rest. Ass'n v. City of Berkeley*,
89 F.4th 1094 (9th Cir. 2024) ....................6

*California v. FDIC*,
584 F.Supp.3d 834 (N.D. Cal. 2022) ....................12

*Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*,
799 F.2d 6 (1st Cir. 1986) ....................6

*Coal. to Def. Affirmative Action v. Brown*,
674 F.3d 1128 (9th Cir. 2012) ....................32

*Columbia Basin Apartment Ass'n v. City of Pasco*,
268 F.3d 791 (9th Cir. 2001) ....................6

*Daniels Sharpsmart, Inc. v. Smith*,
889 F.3d 608 (9th Cir. 2018) ....................24

*Ellis v. City of Corvallis*, 2025 U.S. Dist. LEXIS 5123 (D. Or. Jan. 10, 2025)....................26, 29

*Emmert Indus. Corp. v. Artisan Assocs., Inc.*, 497 F.3d 982 (9th Cir. 2007) ....................14

*Ex parte Young*,
209 U.S. 123 (1908)....................31

*FCC v. Pacifica Found.*,
438 U.S. 726 (1978)....................18



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

*Feldman v. Ariz. Sec'y. of State's Office*,
843 F.3d 366 (9th Cir. 2016) ....29

*Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180 (9th Cir. 2024) ....3, 25, 28

*Garcia v. United States*,
469 U.S. 70 (1984)....18

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013) ....29

*Grand River Enters. Six Nations v. Knudsen*,
2024 U.S. App. LEXIS 14597 (9th Cir. June 14, 2024) ....27

*Greenwood Trust Co. v. Massachusetts*,
971 F.2d 818 (1st Cir. 1992)....11, 12, 22

*Healy v. Beer Instit.*,
491 U.S. 324 (1989)....23, 24

*Hernendez v. Sessions*, 872 F.3d 976 (9th Cir. 2017)....26

*Idaho v. Coeur d'Alene Tribe*,
794 F.3d 1039 (9th Cir. 2015) ....27

*LA Int'l Corp. v. Prestige Brands Holdings, Inc.*,
168 F.4th 608 (9th Cir. 2026) ....18

*Lackey v. Stinnie*,
604 U.S. 192 (2025)....18

*Longworth v. Trump*, 2026 U.S. Dist. LEXIS 42029 (D. Or. March 2, 2026). ....28

*Marietta Mem'l Hosp. Emp. Health Ben. Plan v. DaVita, Inc.*,
596 U.S. 880 (2022)....18

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.*,
439 U.S. 299 (1978)....9, 10, 12

*Melendres v. Arpaio,* 695 F.3d 990 (9th Cir. 2012)....26

*Meritage Homeowners' Ass'n v. Bank of N.Y. Mellon*, 2018 U.S. Dist. LEXIS 73229 (D. Or. May 1, 2018) ....25

*Midwest Title Loans, Inc. v. Mills*,
593 F.3d 660 (7th Cir. 2010) ....24



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

*NAIB v. Weiser*,
159 F.4th 694 (10th Cir. 2025) ....................14

*NAIB v. Weiser*,
No. 24-1293, 2026 U.S. App. LEXIS 9563 (10th Cir. April 2, 2026)....................2, 14

*NAIB v. Weiser*,
737 F.Supp.3d 1113 (D. Colo. 2024).................... *passim*

*Or. Council for Humanities v. United States Doge Serv.*,
794 F.Supp.3d 840 (D. Or. 2025) ....................6

*Sam Francis Found. v. Christies, Inc.*,
784 F.3d 1320 (9th Cir. 2015) (en banc) ....................24

*Scott v. Roberts*,
612 F.3d 1279 (11th Cir. 2010) ....................29

*Silvester v. Harris*,
2014 U.S. Dist. LEXIS 162771 (E.D. Cal. Nov. 20, 2014) ....................5, 29

*Smith v. Berryhill*,
587 U.S. 471 (2019)....................13

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2003)....................6

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) ....................4, 25, 26, 28, 29

*United States v. Gonzales*,
456 F.3d 1178 (10th Cir. 2006) ....................19

*United States v. Hopson*,
150 F. 4th 1290 (10th Cir. 2025) ....................18

*United States v. Maciel-Alcala*, 612 F.3d 1092 (9th Cir. 2010) ....................13

*United States v. Nishiie*,
996 F.3d 1013 (9th Cir. 2021) ....................19

*Valle Del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) ....................29

*Vasquez Perdomo v. Noem*,
148 F.4th 656 (9th Cir. 2025) ....................5, 6



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

*Washington v. United States HHS*, 2025 U.S. Dist. LEXIS 211013 (D. Or. Oct. 27, 2025) ....28

*Winter v. Natural Resources Defense Council*, 555 U.S. 7 (2008) ....3, 25, 28

*Wisconsin Central Ltd. v. United States*, 585 U.S. 274 (2018) ....17

**Statutes**

12 U.S.C. § 85 .... *passim*

12 U.S.C. § 1709-1a(b) ....17, 18

12 U.S.C. § 1735f-7 ....17, 18

12 U.S.C. § 1831d .... *passim*

28 U.S.C. § 2201 ....31

Act of Dec. 21, 1979, Pub. L. No. 96-153, § 308, 93 Stat. 1101, 1113-14 ....17

Depository Institutions Deregulation and Monetary Control Act of 1980, Pub. L. No. 96-221, 94 Stat. 132 .... *passim*

ORS § 725.010 ....3

ORS § 725.015 ....1, 3, 7, 8

ORS § 725.340 ....3

Veterans Housing Act Amendments of 1976, Pub. L. No. 94-324, § 8, 90 Stat. 720, 722-23 ....17

**Rules**

Fed.R.Civ.P. 65 ....1, 3

Local Rule 7-1(a) ....1

**Other Authorities**

125 Cong. Rec. 30655 (Nov. 1, 1979) ....11

FDIC Amicus Brief, *Greenwood Tr. Co. v. Massachusetts*, 1992 WL 12577410 (1st Cir. Feb. 27, 1992) ....22



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

FDIC Interp. Ltr. No. 83-16, 1983 WL 207393 (Oct. 20, 1983) ....................21, 22

FDIC National Survey of Unbanked and Underbanked Households (2023)....................30

Eleanor Erdevig, *Small States Teach a Big Banking Lesson*, Chicago Fed. Letter, No. 10 (June 1988)....................20

North Carolina State Banking Comm., Special Mtg. Minutes (Mar. 28, 1983) ....................22



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

## I. LOCAL RULE 7-1 CERTIFICATION

Pursuant to Local Rule 7-1(a), the undersigned counsel for Plaintiffs certify that Plaintiffs have made good faith efforts to resolve the dispute with Defendant through a number of telephone conversations and emails, but have been unable to do so.

## II. MOTION

Plaintiffs National Association of Industrial Bankers ("NAIB"), Online Lenders Alliance ("OLA"), and American Financial Services Association ("AFSA") seek entry of a preliminary injunction to prevent Defendant Sean O'Day from enforcing Section 1, subsection 3 of Oregon House Bill 4116, which is codified at Or. Rev. Stat. ("ORS") § 725.015. This law became effective on June 5, 2026. Plaintiffs separately move to "advance the trial on the merits and consolidate it with the hearing" on the preliminary injunction. Fed.R.Civ.P. 65(a)(2).

Section 1, subsection 3 of House Bill 4116 is preempted by federal law, because it impermissibly seeks to regulate the interest rates charged on interstate consumer finance loans made in other states by state banks in conformity with their home states' laws and federal banking law. As set forth in the Memorandum, under Section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDMCA"), 12 U.S.C. § 1831d, a state bank is authorized to charge interest at the rate allowed by the laws of the state "where the bank is located," and export those home state interest rates in interstate loans made around the country. Any lower interest rate ceiling in the borrower's state is expressly preempted. *Id.* Also, Section 1, subsection 3(b) of House Bill 4116 violates the dormant Commerce Clause to the extent it applies to consumer finance loans made by state banks in other states when the Oregon resident is also out-of-state at the time the loan is made by the bank.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Section 1, subsection 2 of House Bill 4116 exercises Oregon's right to "opt-out" of Section 521 of DIDMCA, which is permitted under Section 525 of DIDMCA. *See* 12 U.S.C. § 1831d note (Effective Date); Pub. L. No. 96-221, 94 Stat. 132, 167. This opt-out prevents *Oregon* state banks from further utilization of the federal interest rate and exportation authority conferred by Section 521 of DIDMCA. However, Section 1, subsection 3 of House Bill 4116 goes further and purports to apply Oregon law to consumer finance loans of $50,000 or less made by out-of-state state banks in their home states in conformity with their own states' laws. That is not permitted by Section 525 of DIDMCA, which allows a state to opt-out only "with respect to loans made in such State." *Id.*

A loan is "made" by the bank, not the borrower, and is "made in" the bank's state. *National Ass'n of Indus. Bankers v. Weiser*, 737 F.Supp.3d 1113 (D. Colo. 2024), *en banc* appeal pending, No. 24-1293, 2026 U.S. App. LEXIS 9563 (10th Cir.). Thus, an opt-out by a state under Section 525 of DIDMCA only allows that state to take away from its *own* state banks their federal interest rate and exportation authority under Section 521 of DIDMCA – it does not authorize the opt-out state to regulate the interest rates charged on interstate loans made by out-of-state state banks in their home states in conformity with their own states' laws. *Id.* Section 1, subsection 3 of House Bill 4116 is expressly preempted by Section 521 of DIDMCA to the extent it purports to apply to out-of-state state banks.

The court in *NAIB* found that Colorado's opt-out pursuant to Section 525 of DIDMCA did not empower it to regulate the interest rates charged by members of NAIB, AFSA, and another trade association who were state banks outside Colorado, and that Colorado's effort to impose its own interest rate caps on loans made by state banks in other states to Colorado residents was expressly preempted by Section 521 of DIDMCA. It granted the motion for a preliminary injunction filed by NAIB, AFSA, and their co-plaintiff, and this Court should do likewise here.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

## III. MEMORANDUM OF POINTS AND AUTHORITIES

### A. Introduction.

Plaintiffs NAIB, OLA, and AFSA seek a preliminary injunction against Defendant under Fed.R.Civ.P. 65 to enjoin enforcement of Section 1, subsection 3 of House Bill 4116. The Bill was signed by Governor Kotek on April 7, 2026, and became effective on June 5, 2026. Section 1, subsection 3 of the Bill amends ORS § 725.015 to apply the 36% interest rate cap in the Oregon Consumer Finance Act (ORS § 725.340(1)(a)(A)) to *all* consumer finance loans[1] of $50,000 or less to borrowers who reside in or maintain a domicile in Oregon, even those consumer finance loans made by state banks in other states in conformity with their own states' laws. This statutory provision is preempted by federal banking law, namely, Section 521 of DIDMCA, which is codified at 12 U.S.C. § 1831d.

As demonstrated below, all of the requirements for entry of a preliminary injunction set forth in *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008), are satisfied here. First and foremost, Plaintiffs are likely to win on the merits, and in any event they have demonstrated "serious questions going to the merits." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024). As correctly held by the District Court in Colorado in *NAIB v. Weiser* when it granted the motion for a preliminary injunction filed by NAIB, AFSA and another plaintiff, a state's exercise of its opt-out right under Section 525 of DIDMCA does not empower it to regulate the interest rates charged by out-of-state state banks on interstate loans made in their own states in conformity with their own states' usury laws. That is because the

[1] Under the Consumer Finance Act, a "'[c]onsumer finance loan' means a loan or line of credit that is unsecured or secured by personal or real property and that has periodic payments and terms longer than 60 days." ORS § 725.010(2).



BALLARD SPAHR LLP
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

loan is "made" by the bank in its home state, and is not "made in" the opt-out state where the borrower resides. Section 525 only authorizes an opt-out state to regulate the interest rates "with respect to *loans made in such State*." Thus, it can eliminate its *own* state banks' ability to charge and "export" interest as permitted by Section 521 of DIDMCA. It cannot limit the interest rates charged by out-of-state state banks which make interstate loans in their own states at rates permitted by those states. Also, Section 1, subsection 3(b) of House Bill 4116 violates the dormant Commerce Clause to the extent it applies even if the borrower is not present in Oregon when the consumer finance loan is made by the out-of-state state bank.

Plaintiffs' likelihood of success on their constitutional claims is sufficient to presume irreparable injury. *See United States v. California*, 173 F.4th 1060, 1069 (9th Cir. 2026); *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). Also, unless Section 1, subsection 3 of House Bill 4116 is enjoined, NAIB's, OLA's, and AFSA's state-chartered bank members which make consumer finance loans to Oregon residents at interest rates above Oregon's rate ceiling will suffer irreparable harm in the form of lost revenue that cannot be recovered from the State, damage to goodwill, lost customers and opportunities for new customers, and other harms. These irreparable harms were highlighted by the court in *NAIB v. Weiser* when it granted a preliminary injunction in favor of NAIB, AFSA, and their co-plaintiff against enforcement of the Colorado opt-out statute. 737 F.Supp.3d at 1133-34.

Finally, just as in *NAIB v. Weiser*, the balance of equities and public interest also weigh heavily in favor of granting a preliminary injunction. The Ninth Circuit has held that "preventing a violation of the Supremacy Clause serves the public interest." *United States v. California*, 173 F. 4th at 1069. *See also Ass'n for Accessible Meds. v. Bonta*, 562 F.Supp.3d 973, 989 (E.D. Cal. 2021) ("the public interest favors a permanent injunction because Plaintiff has established a



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

likelihood of success on its dormant Commerce Clause claim."). Conversely, the "enforcement of an unconstitutional law is contrary to the public interest." *Silvester v. Harris*, 2014 U.S. Dist. LEXIS 162771, at *13 (E.D. Cal. Nov. 20, 2014). Enforcement of Section 1, subsection 3 of House Bill 4116 will cause irreparable harm to NAIB's, OLA's, and AFSA's state bank members in other states who make consumer finance loans to Oregon residents. Also, it will harm low-income Oregon consumers who are unbanked or underbanked and have long relied on the availability of consumer finance loans from NAIB's, OLA's, and AFSA's state bank members located in other states. House Bill 4116 does not have any effect on national banks, whose interest rate authority is derived from Section 85 of the National Bank Act, 12 U.S.C. § 85. Enforcement of Section 1, subsection 3 of House Bill 4116 against out-of-state state banks will reduce competition by them and thus give national banks freer rein to charge higher interest rates to credit-challenged consumers in Oregon.

In addition, entry of a preliminary injunction will simply restore the *status quo ante* that already existed for 46 years, since the enactment of DIDMCA in March 1980.

## IV. ARGUMENT

### A. NAIB, OLA, and AFSA Have Associational Standing.

As a threshold matter, NAIB, OLA, and AFSA have associational standing. They are suing on behalf of their members who are state banks located outside Oregon that would be harmed by enforcement of Section 1, subsection 3 of House Bill 4116. In *Vasquez Perdomo v. Noem*, 148 F.4th 656, 676 (9th Cir. 2025), the Court of Appeals stated:

> To establish 'associational' standing and bring suit on behalf of its members, an association must show that: '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.



BALLARD SPAHR LLP
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

(quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2003)). *Accord Or. Council for the Humanities v. United States Doge Serv.*, 794 F.Supp.3d 840, 895 (D. Or. 2025). The association need only show that "at least one" of its members would have standing to sue in its own right. *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1099 (9th Cir. 2024).

In *Vasquez Perdomo*, the Ninth Circuit stressed that "membership organizations may bring constitutional claims on behalf of their members," and where, as here, an association "seek[s] only prospective injunctive relief (not damages), individual participation is not necessary for effective relief." 148 F.4th at 677. *Accord Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001) (holding that association's claims for injunctive relief "do not require individualized proof" of harm); *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178, 1181 (9th Cir. 1998) (same); *Or. Council for the Humanities*, 794 F.Supp.3d at 895 ("[a]ctions for declaratory, injunctive and other relief have generally been held particularly suited to group representation" (quoting *Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir. 1986))).

In *California Restaurant Ass'n*, the Court explained that in determining whether the associational standing requirements are met at the pleadings stage, "we must 'accept as true all material allegations of the complaint' and 'construe the complaint in favor of the complaining party.'" 89 F.4th at 1100 (citation omitted). Here, the allegations of the Complaint, along with the accompanying Declarations by NAIB, OLA, AFSA, and several of their state bank members, demonstrate that NAIB's, OLA's, and AFSA's members have suffered and will continue to suffer an injury in fact on account of Section 1, subsection 3 of House Bill 4116, which suffices to establish NAIB's, OLA's, and AFSA's associational standing.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

In *NAIB v. Weiser*, the court found under identical circumstances that members of NAIB, AFSA, and their co-plaintiff had suffered injury in fact because of the Colorado opt-out statute and Colorado's threatened enforcement of its own state interest rate caps against those members. 737 F.Supp.3d at 1124-25. In words equally applicable here, the court held:

> When plaintiffs take preventative measures and forego lawful conduct in order to avoid a credible threat of enforcement of an allegedly unlawful statute, then they have suffered a cognizable injury for standing purposes… A threat of enforcement is generally credible where (1) a challenged statutory provision on its face proscribes the conduct in which a plaintiff wishes to engage, and (2) the state has not disavowed any intention of invoking the provision against the plaintiff…'[T]he existence of a statute implies the threat of its enforcement…'

*Id*. at 1125 (citations omitted).

Here, too, NAIB's, OLA's, and AFSA's members have "suffered a cognizable injury for standing purposes" (*id.*), so NAIB, OLA, and AFSA possess associational standing.

### B. <u>Oregon's Opt-Out</u>.

Section 1 of House Bill 4116 amends ORS § 725.015 to state as follows:

> SECTION 1. ORS 725.015 is amended to read:
>
> 725.015. (1) Except as provided in subsection (2) of this section, this chapter does not limit a person's rights, powers or privileges under another law of this state or of the United States that regulates lending money or extending credit if the person complies with the other law.
>
> (2) The Legislative Assembly hereby declares that this state does not want any of the amendments set forth in section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (P.L. 96-221, 94 Stat. 132) to apply to consumer finance loans made in this state.
>
> (3) A person is subject to this chapter if the person engages in the business of making consumer finance loans of $50,000 or less or if the person acts as an agent, broker or facilitator for a person that engages in the business of making consumer finance loans of $50,000 or less to a consumer who resides in or maintains a domicile in this state and the consumer:



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

> (a) Negotiates, agrees to the terms of or enters into or executes a contract for a consumer finance loan of $50,000 or less in person, by mail, by telephone or via the Internet while the consumer is physically present in this state; or
>
> (b) Makes a payment on a consumer finance loan of $50,000 or less in which:
>
> (A) A person debits an account that the consumer holds in this state at a financial institution or trust company, as those terms are defined in ORS 706.008; or
>
> (B) The consumer makes the payment by means of a negotiable instrument drawn on a financial institution or trust company, as those terms are defined in ORS 706.008.

Section 1, subsection 3 casts an unconstitutionally overbroad net. So long as the borrower resides in or is domiciled in Oregon, the statute applies, *regardless* of where the bank makes the consumer finance loan.[2] What's more, subsection 3(b) also applies *regardless* of where the *borrower* is located when the out-of-state state bank makes the loan, even if the borrower is present in the bank's state or a different state with interest rate ceilings above Oregon's 36% cap, so long as the borrower makes a payment on the loan by debiting an account at a financial institution or trust company in Oregon, or by using a negotiable instrument drawn on a financial institution or trust company in Oregon.

While Section 1, subsection 2 of House Bill 4116 represents a legitimate exercise of Oregon's opt-out power under Section 525 of DIDMCA, this opt-out merely prevents state banks *located in Oregon* from continuing to enjoy their federal interest rate authority under Section 521 of DIDMCA on loans they make in Oregon and prevents them from further exportation of Oregon

---

[2] Not only does the text of subsection 3 make clear that it extends to consumer finance loans made by out-of-state state banks in their home states, the June 4, 2026 press release issued by the DCBS sets forth its position that the statute precludes those banks from continuing "to export other states' interest rates" in their loans to Oregon borrowers. https://apps.oregon.gov/oregon-newsroom/OR/DCBS/Posts/Post/high-interest-loans.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

interest rates in their interstate loans.[3] The opt-out does *not* empower Oregon to regulate the interest rates charged by state banks in *other* states on loans made by them in those states in conformity with their own states' laws. Such regulation is within the sole purview of the state banks' home states. Thus, Section 1, subsection 3 of House Bill 4116 is preempted by the express preemption clause in Section 521 of DIDMCA. *See NAIB v. Weiser*, 737 F.Supp.3d at 1133. Also, Section 1, subsection 3(b) violates the dormant Commerce Clause to the extent it applies the Oregon Consumer Finance Act to instances where the borrower is also outside Oregon when the loan is made by the out-of-state state bank.

### C. The National Bank Act and *Marquette*.

Section 85 of the National Bank Act, 12 U.S.C. § 85, governs national banks. It provides that national banks may charge "interest at the rate allowed by the laws of the State … where the bank is located, or at a rate [1% higher than the federal discount rate], whichever [is] … greater." 12 U.S.C. § 85. In 1978, the Supreme Court unanimously held in *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 311-12 (1978), that Section 85 of the National Bank Act allows a national bank to charge the interest rates permitted in the state where the national bank is located when making loans to consumers who reside in other states. The Court ruled that a national bank headquartered in Nebraska was permitted to make credit card loans to residents of Minnesota using Nebraska interest rates, and Minnesota's lower interest-rate limits were preempted.

---

3 Oregon now becomes one of only four jurisdictions that is currently opted-out of Section 521 of DIDMCA–the others are Colorado, Iowa, and Puerto Rico. Five other states (Maine, Massachusetts, Wisconsin, Nebraska, and North Carolina) originally opted-out but subsequently repealed their opt-outs because they realized that the opt-outs were harming their own state banks and consumers.



BALLARD SPAHR LLP
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

*Marquette* specifically rejected the argument that "the 'exportation' of interest rates … will significantly impair the ability of States to enact effective usury laws." *Id.* at 318. Justice Brennan's opinion for the Court acknowledged that "[t]his impairment may in fact be accentuated by the ease with which interstate credit is available by mail through the use of modern credit cards." *Id.* However, the opinion emphasized that "state usury laws must, of course, give way to the federal statute," and "the protection of state usury laws is an issue of legislative policy, and any plea to alter section 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court." *Id*. and n. 31.

## D. <u>DIDMCA</u>

### 1. <u>Section 521 of DIDMCA</u>.

Two years after *Marquette,* Congress enacted DIDMCA. The legislative history of DIDMCA demonstrates that the entire Congressional focus was on creating a level playing field for state-chartered depository institutions and the national banks against which they competed in their home state. The sponsors of the usury provisions were Senators Pryor and Bumpers of Arkansas, which had a 10% usury ceiling. However, notwithstanding that limit, national banks were authorized under Section 85 of the National Bank Act to make loans to Arkansas residents at 1% above the Federal Reserve discount rate, which was then 12%. Inflation was soaring, and state banks in Arkansas could not afford to make loans to Arkansas residents within the 10% ceiling, leaving them at a competitive disadvantage against national banks.

Senator Pryor explained the unfair situation confronting Arkansas' state banks and savings and loan associations in competing with national banks in making intrastate loans to borrowers in Arkansas:



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

> We have, as the Senators well know by now, a strict 10-percent interest rate ceiling on all types of loans. *A customer seeking a loan to buy a car is unlikely to find the funds at a State bank since State banks can charge no more than 10 percent interest, which is not enough to cover the cost of funds plus service costs. This customer is forced to turn to a national bank which can presently charge 13 percent. That customer is also likely to deposit his money in that bank.*
>
> * * * *
>
> [W]hen the discount rate is higher than the usury limit, the State banks and savings and loans are placed in an impossible grossly unfair situation.

125 Cong. Rec. 30655 (Nov. 1, 1979) (emphasis added).

In *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818 (1st Cir. 1992), the First Circuit explained "the historical context" underlying the enactment of DIDMCA:

> As the 1970s wound down, the Nation was caught in the throes of a devastating credit crunch. Interest rates soared … Nevertheless, state lending institutions were constrained in the interest they could charge by state usury laws which often made loans economically unfeasible from a lender's coign of vantage … National banks did not share this inhibition because they could charge whatever interest rates were allowed under the National Bank Act of 1864 … and specifically, those rates which were permitted under Bank Act § 85 … Since section 85 authorized national banks to use interest rates set by reference to federal discount rates, state institutions were at an almost insuperable competitive disadvantage.

*Id*. at 826 (citations omitted).

To create parity between state-chartered banks and national banks, Congress enacted Section 521 of DIDMCA, which amended Section 27 of the Federal Deposit Insurance Act and is codified at 12 U.S.C. §1831d. It conferred on state banks the same interest rate authority conferred on national banks by Section 85 of the National Bank Act, namely, the ability to charge either the bank's home state rates or 1% above the Federal Reserve discount rate. Section 521 provides:

> *In order to prevent discrimination against State-chartered insured depository institutions*, including insured savings banks and insured mutual savings banks, or insured branches of foreign banks *with respect to interest rates*, if the applicable rate prescribed in this subsection exceeds the rate such State bank or insured branch



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

> of a foreign bank would be permitted to charge in the absence of this subsection, such State bank or such insured branch of a foreign bank may, *notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section*, take, receive, reserve, and charge *on any loan or discount made*, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located or at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.

12 U.S.C. § 1831d; 94 Stat. at 164–65 (emphasis added).

In the landmark *Greenwood Trust* decision, which has been repeatedly and uniformly followed by other courts, the First Circuit held that the enactment of Section 521 meant that state banks, like their national bank counterparts, could charge interest at the rates allowed by their home states or 1% above the Federal Reserve discount rate and export those interest rates in their interstate loans pursuant to *Marquette*:

> While we believe that several principles inherent in section 85 were transfused into section 521, the critical item for present purposes is the principle of exportation. This principle, solidly embedded in the language and purpose of both acts, provides the mechanism whereby a bank may continue to use the favorable interest laws of its home state in certain transactions with out-of-state borrowers. *See Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 313-19 (1978); *Gavey*, 845 F.2d at 521. *To the extent that a law or regulation enacted in the borrower's home state purports to inhibit the bank's choice of an interest term under section 521, DIDA expressly preempts the state law's operation.*

*Greenwood Tr.*, 971 F.2d at 827 (emphasis added). *Accord California v. FDIC*, 584 F.Supp.3d 834, 838 (N.D. Cal. 2022) (same).

**2. <u>Section 525 of DIDMCA</u>.**

Congress was mindful of federalism concerns, and thus it provided in Section 525 of DIDMCA that states could opt-out of the preemption provisions in Sections 521-523 "with respect



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

to loans made in such State."[4] Section 525 states in pertinent part as follows:

> The amendments made by sections 521 through 523 of this title shall apply only with respect to loans made in any State during the period beginning on April 1, 1980, and ending on the date, on or after April 1, 1980, on which such State adopts a law or certifies that the voters of such State have voted in favor of any provision, constitutional or otherwise, which states explicitly and by its terms that such State does not want the amendments made by such sections to apply *with respect to loans made in such State...*

94 Stat. at 167; 12 U.S.C. §1831d note (Effective Date) (emphasis added).

**E. <u>Section 1, Subsection 3 of House Bill 4116 is Preempted by Section 521 of DIDMCA</u>**

As shown above, Section 521 allows state-chartered banks to "charge on any loan or discount *made*" by them the interest rates allowed by the law of the state "where the bank is located," and makes no reference to the borrower's location. There is nothing in the statutory text to support the illogical notion that although a state bank's permissible interest rates are dependent solely on the bank's location for purposes of Section 521, they also depend on the borrower's location if the borrower resides in an opt-out state. Because interest rates "on any loan or discount *made*" pursuant to Section 521 are based solely on the bank's location, the phrase "loans *made* in such State" in Section 525 similarly must refer only to the state where the bank is located. Stated differently, where a loan is "made" under Section 521 should not differ from where it is "made" under Section 525. *See Smith v. Berryhill*, 587 U.S. 471, 479 (2019) ("the normal rule of statutory interpretation [is] that identical words used in different parts of the same statute are generally presumed to have the same meaning"); *United States v. Maciel-Alcala*, 612 F.3d 1092, 1098 (9th Cir. 2010) ("We interpret identical phrases used in the same statute to bear the same meaning.");

---

[4] Sections 522 and 523 of DIDMCA preempted state law interest rate caps with respect to state-chartered savings and loan associations and credit unions, respectively.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

*Emmert Indus. Corp. v. Artisan Assocs., Inc.*, 497 F.3d 982, 987 (9th Cir. 2007) ("[B]ecause the word 'charges' as used in other sections of the ICCTA includes both tariff and non-tariff charges, the same meaning should apply to the word 'charges' in § 14705(a).").

It also bears emphasis that Section 525 refers just to a *single* state where a loan is "made" ("loans made in *such State*"). This belies the notion that, under Section 525, a loan is "made" in both the bank's state and the borrower's state.

The opt-out right conferred by Section 525 of DIDMCA could be exercised if a state, as sovereign master over its *own* state banks, wanted to reimpose its usury ceilings *on loans made by its own state banks in its own state*. For example, Arkansas could opt-out under Section 525, and thereby once again restrict Arkansas state banks to the Arkansas 10% usury ceiling, eliminating their federal right under Section 521 to charge 1% above the Federal Reserve discount rate, which was 12% when DIDMCA was enacted. But an opt-out by a state does *not* empower it to encroach on *other* states' sovereign powers to regulate the interest rates charged on interstate loans made in those states by their own state banks.

In the only decision construing Section 525 of DIDMCA, the District Court for the District of Colorado held that Colorado's opt-out statute was preempted to the extent it purported to regulate the interest rates charged to Colorado residents by state banks located in other states. The court ruled that "[t]he plain meaning of Section 1831d's opt-out provision is that what state a loan is 'made in' depends on where the bank is located and performs its loan-making functions and does not depend on the location of the borrower." *NAIB v. Weiser*, 737 F.Supp.3d at 1133.[5]

---

[5] On appeal, a divided panel of the Tenth Circuit reversed the District Court's decision. *NAIB v. Weiser*, 159 F.4th 694 (10th Cir. 2025). But the Tenth Circuit granted rehearing en banc and vacated the panel's decision. *NAIB v. Weiser*, No. 24-1293, 2026 U.S. App. LEXIS 9563



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

The court stated that its conclusion that "only the bank 'makes' a loan" is "more consistent both with the ordinary colloquial understanding of who 'makes' a loan, and, more importantly, with how the words 'make' and 'made' are used consistently throughout the text of the Federal Deposit Insurance Act, including the DIDA amendments, as well as throughout the rest of Title 12 of the United States Code, which governs 'Banks and Banking' and includes the National Bank Act." *Id.* at 1129.[6] It bears emphasis that there are no statutory provisions in the Federal Deposit

---

(10th Cir. April 2, 2026). The *en banc* appeal is pending. It is noteworthy that the Oregon Legislature enacted House Bill 4116 after the Tenth Circuit's divided panel decision but *before* it was vacated upon the grant of rehearing en banc. Indeed, the Division of Financial Regulation of the DCBS submitted written testimony to the Legislature that relied heavily on the Tenth Circuit's panel decision, which was subsequently vacated. *See* https://olis.oregonlegislature.gov/liz/2026R1/Downloads/PublicTestimonyDocument/227091 at p. 6.

6 The court pointed out the many statutory provisions in Title 12 of the United States Code that repeatedly make crystal clear the view of Congress that only banks "make" a loan, while borrowers "receive" or "obtain" a loan:

> Section 1831d itself says that a "State *bank* . . . may . . . charge on any loan or discount *made*," interest up to the specified rates—which implies that it is the bank that "makes" a loan. 12 U.S.C. § 1831d(a) (emphases added). Other sections of the Federal Deposit Insurance Act consistently use "make" and "made" in the same way, *i.e.*, a loan is *"made" by a bank to a borrower. See, e.g.,* 12 U.S.C. § 1828(o)(3) ("a loan *made by* an *insured depository institution*…. " (emphases added)); 12 U.S.C. § 1831b(a) ("No *insured depository institution* . . . [or] *bank* which is not an insured depository institution, shall *make* any . . . loan . . . ." (emphases added)).
>
> Various other sections of Title 12 reinforce this understanding. *See, e.g.*, 12 U.S.C. § 83(a) ("No national *bank* shall *make* any loan ...." (emphases added)); 12 U.S.C. § 85 ("Any *association* may . . . charge on any loan . . . *made* . . . interest at the rate allowed . . . ." (emphases added)); 12 U.S.C. § 143 (an "*association* shall not increase its liabilities by *making* any new loans" (emphases added)); 12 U.S.C. § 371(a) ("Any national *banking association* may *make* . . . loans or extensions of credit . . . ." (emphases added)); 12 U.S.C. § 1757(5) ("A Federal *credit union* . . . shall have power . . . to *make* loans . . . ." (emphases added)); 12 U.S.C. § 1785(f)(1) ("Every insured *credit union* is authorized to . . . *make* loans . . . ." (emphases



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Insurance Act or elsewhere in Title 12 of the United States Code where the word "made" is used to describe the *borrower's* conduct with respect to the loan.

The court in *NAIB v. Weiser* reasoned as follows:

> Congress's use of 'made' puts the focus on the act of making a loan. In plain parlance, it is the lender who *makes* a loan; nobody thinks of themselves as 'making a loan' when they borrow money from a family member or put a charge on a credit card. Had Congress sought to put the focus on the borrower, as the State argues, it could have done so in many ways. Most easily, for example, by allowing states to opt out as to loans 'made to borrowers in such State.' Or without even changing the structure of the sentence, Congress could have simply used a borrower-focused word like 'accepted' or 'obtained' 'in such State.' Instead, it put the focus on where a loan is 'made,' which puts the focus on the lender…

*Id*. at 1129 (emphasis in original).

If Congress had intended "to put the focus on the borrower" (*id.*), it also could have drafted Section 525 of DIDMCA to allow a state to opt-out as to loans "made or executed" in such state, but it did not do so. In stark contrast, just three months earlier, the same 96th Congress enacted a different banking statute preempting state usury laws but allowing states to override preemption as to certain FHA loans "made or executed" in such State. On December 21, 1979, it amended the National Housing Act as follows:

---

> added)); 12 U.S.C. § 2610 ("No fee shall be imposed . . . by a *lender* in connection with a . . . loan *made by* it ...." (emphases added)); 12 U.S.C. § 4742(4) ("a loan *made by* a participating *financial institution*" (emphases added)). In contrast, when "obtain"—but not "make"—loans. *See, e.g.*, 12 U.S.C. § 2279aa(7)(C) ("a loan . .
>
> Title 12 speaks to action by borrowers, it states that borrowers "receive" or. by a cooperative lender to a *borrower* that has *received* . . . a loan" (emphases added));
>
> 12 U.S.C. § 4742(10)(A) ("depositing all required premium charges paid . . . by each *borrower receiving* a loan" (emphasis added)); 12 U.S.C. § 5602(b)(1) ("protecting *borrowers* with respect to the *obtaining* of . . . loans" (emphases added)).

*NAIB v. Weiser*, 737 F.Supp.3d at 1129-30 (emphasis in original).



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

EXEMPTION FROM STATE USURY LAWS

> Sec. 308. Title V of the National Housing Act is amended by adding the following new section at the end thereof:
>
> "Sec. 529.(a) The provisions of the constitution of any State expressly limiting the rate or amount of interest, discount points, or other charges which may be charged, taken, received, or reserved by lenders and the provisions of any State law expressly limiting the rate or amount of interest, discount points, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, or advance which is insured under title I or II of this Act.
>
> "(b) The provisions of subsection (a) shall apply to loans, mortgages, or advances *made or executed* in any State until the effective date (after the date of enactment of this section) of a provision of law of that State limiting the rate or amount of interest, discount points, or other charges on any such loan, mortgage, or advance."[7]

This was very similar to a different amendment to the National Housing Act three years earlier that likewise allowed states to override federal preemption of state law interest limitations with respect to certain "loans, mortgages, or other interim financing *made or executed* in" such State.[8]

Thus, Congress knew full well how to be explicit on this issue, and its decision to use only the lender-centric word "made" in Section 525 without also adding the more bilateral term "executed" as it had done just three months earlier in 12 U.S.C. § 1735f-7 and three years earlier in 12 U.S.C. § 1709-1a(b) is highly significant. The decision in *Wisconsin Central Ltd. v. United States*, 585 U.S. 274, 279 (2018), is squarely on point:

> We usually 'presume differences in language like this convey differences in meaning'… And that presumption must bear particular strength when the same

---

7 Act of Dec. 21, 1979, Pub. L. No. 96-153, § 308, 93 Stat. 1101, 1113-14, codified at 12 U.S.C. § 1735f-7 (emphasis added).

8 Veterans Housing Act Amendments of 1976, Pub. L. No. 94-324, § 8, 90 Stat. 720, 722-23, codified at 12 U.S.C. § 1709-1a(b) (emphasis added).



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

> Congress passed both statutes to handle much the same task … Its choice to use the narrower term [in just one of the statutes] requires respect, not disregard.

*Accord Marietta Mem'l Hosp. Emp. Health Ben. Plan v. DaVita, Inc.*, 596 U.S. 880, 887 (2022) ("Congress knew how to write such a law. It did not do so in this statute."); *Lackey v. Stinnie*, 604 U.S. 192, 205 (2025) ("It is Congress's job to craft policy and ours to interpret the words that codify it. 'Atextual judicial supplementation is particularly inappropriate when … Congress has shown that it knows how to adopt the omitted language or provision.'" (citation omitted)); *Bare v. Barr*, 975 F.3d 952, 968 (9th Cir. 2020) ("We must presume that Congress intended a different meaning when it uses different words in connection with the same subject. Congress, then, must have intended something different by using 'grant' to describe an alien becoming an asylee and 'adjust to' to describe that same alien later becoming a lawful permanent resident." (citation and quotations omitted)); *United States v. Hopson*, 150 F. 4th 1290, 1304 (10th Cir. 2025) ("When Congress knows how to achieve a specific statutory effect, its failure to do so evinces an intent not to do so" (quotation omitted; italics in original)).

Moreover, Congress's use of the disjunctive phrase "made *or* executed" in both 12 U.S.C. § 1735f-7 and 12 U.S.C. § 1709-1a(b)[9] demonstrates that Congress did not view the terms "made" and "executed" as synonymous. *See, e.g., Garcia v. United States*, 469 U.S. 70, 73 (1984) ("Canons of construction indicate that terms connected in the disjunctive in this manner [separated by "or"] be given separate meanings."); *FCC v. Pacifica Found.*, 438 U.S. 726, 739-40 (1978) ("The words 'obscene, indecent, or profane' are written in the disjunctive, implying that each has a separate meaning."); *LA Int'l Corp. v. Prestige Brands Holdings, Inc.*, 168 F.4th 608, 619 (9th

[9] These two statutes are part of the National Housing Act, as was Section 522 of DIDMCA. 94 Stat. at 165.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Cir. 2026) ("Congress strung together the clauses in Section 2(a) with the disjunctive 'or,' which requires that we treat the clauses separately."); *United States v. Nishiie*, 996 F.3d 1013, 1023 (9th Cir. 2021) (similar); *United States v. Gonzales*, 456 F.3d 1178, 1182 (10th Cir. 2006) ("Gonzales' reading of the statute, however, ignores the inclusion of the term 'or' between 'steals' and 'removes.' The use of the disjunctive 'or' indicates 'steals' and 'removes' are to have different meanings … Otherwise the term 'or' in the statute would be superfluous.").

In sum, although the 96th Congress chose in Section 529 of the National Housing Act to allow a state to countermand preemption of its usury laws with respect to loans that are either "made or executed in" the state, it decided just three months later that the preemption override in Section 525 of DIDMCA would be more narrowly confined just to "loans made in such State." Given this legislative context, there is no basis to conclude that the phrase "loans made in such State" refers to loans executed in the opt-out state by the borrower.

Nothing in the legislative history of DIDMCA demonstrates that Congress enacted Section 525 in order to enable an opt-out state to limit the interest rates charged to its citizens on interstate loans made by out-of-state banks in conformity with their own states' laws. As shown above, Congress enacted DIDMCA at a time of rampant inflation and sky-high interest rates in order to assist state banks in Arkansas and other states with low interest rate ceilings by allowing them to *increase* their interest rates to 1% above the Federal Reserve discount rate – there was no discussion about a need to *lower* the interest rates that could be charged by *any* state banks.

Also, an interpretation of Section 525 that would allow an opt-out state to limit the interest rates charged by out-of-state state banks would obviously disadvantage those banks vis-à-vis out-of-state national banks, whose ability under Section 85 of the National Bank Act to export their home states' interest rates is unaffected by a state opt-out. This flies in the face of the overriding



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Congressional intent to create interest rate parity between state and national banks, which is clearly expressed in the preamble of Section 521. *See* 12 U.S.C. § 1831d ("[i]n order to prevent discrimination against State-chartered insured depository institutions … with respect to interest rates").

Nor is there anything in the legislative history of DIDMCA reflecting any Congressional concern about the exportation of interest rates charged by out-of-state state banks in their interstate loans. Indeed, that is hardly surprising, because state bank credit card and other interstate consumer lending programs did not take off until after they obtained the same federal interest rate authority as national banks through enactment of DIDMCA in March 1980.

That delay resulted from the fact that most of the state banks desiring to expand their interstate consumer lending programs were then located in states like New York that had relatively low usury ceilings and there were severe restrictions on a bank chartered in one state being affiliated with a bank chartered in another state. Those hurdles were not overcome until after DIDMCA's enactment, when South Dakota and Delaware enacted legislation deregulating their usury laws and authorizing out-of-state banks to establish affiliated credit card banks in their states. 1980 South Dakota Session Laws chap. 335 (H.B. 1046) and chap. 331 (H.B. 1370); 63 Del. Laws, ch. 2, §§ 2-23 (1981).[10] Various other states then followed suit in ensuing years.

In the ongoing *NAIB v. Weiser* litigation concerning the Colorado opt-out statute, both the Federal Deposit Insurance Corporation ("FDIC") and Office of the Comptroller of the Currency ("OCC") filed amicus briefs in the Tenth Circuit in support of NAIB, AFSA, and their co-plaintiff.

---

10 *See* Eleanor Erdevig, *Small States Teach a Big Banking Lesson*, Chicago Fed. Letter, No. 10 (June 1988), https://www.chicagofed.org/publications/chicago-fed-letter/1988/june-10.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

They argued that Colorado's attempt to limit interest rates charged by out-of-state state banks was preempted. *See NAIB v. Weiser*, No. 24-1293 (10th Cir.) at Dkt. Nos. 146, 147, 197, 205. In an amicus brief filed very recently (June 4, 2026), the FDIC argued as follows:

> [U]nder Colorado's interpretation, a Section 525 opt-out would not simply restore the interest rate regime to the one that would apply in the absence of Section 521, it would effectively override other states' decisions *not* to opt-out of Section 521 for banks located in their borders that lend to Colorado borrowers. This does not respect federalism, it contravenes it.
>
> * * * *
>
> A state that chooses to opt out could thus restore its own usury regime, and banks located in that state would not benefit from the parity with national banks that Section 521 provides those banks when making loans in that state. Colorado's interpretation does more, aggrandizing its rights at the expense of other states that have chosen a different interest-rate regime. In Colorado's view, Section 525 gives it the power to override parity not just for its own banks, but also for banks located in other states whose legislatures may have purposefully chosen to preserve Section 521's interest-rate regime. Nothing in the text or context suggests that states, "by opting out of Section 521, can discard the policy of competitive equality for their state-chartered banks *and also for out-of-state, state-chartered banks*." Dissent at 11, ECF 126-1 (emphasis in original). Otherwise, Section 525 would no longer exist as a limited exception to Section 521; rather, it would evolve into a means for empowering any state to effectively dictate the usury policies of its neighbors. As the [bank trade associations'] brief ably demonstrates, neither the statute's text, structure, context, or purpose support that result.

Dkt. No. 197 at pp. 4, 6-7 (emphasis in original).

The OCC similarly argued as follows in its June 4, 2026 amicus brief:

> Congress's purpose in enacting DIDMCA further supports the district court's narrow interpretation of the scope of Colorado's opt-out authority. The purpose of Section 521 was to put state banks on par with national banks regarding interest rate authority, including the ability to export its rates. Because Section 525 is an exception that allows a state to restore pre-DIDMCA competitive inequality, it should be interpreted narrowly, lest the exception swallow the rule and undermine congressional intent.
>
> Otherwise, an opt-out state—Colorado, in this case—could effectively dictate the interest rate that a state bank located outside of Colorado may charge, thereby extending the reach of the opt-out far beyond Colorado's borders.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Dkt. No. 205 at pp. 10-11.

The FDIC has long advised the state banks it regulates that loans are "made" for purposes of Section 525 of DIDMCA where the bank is located. In 1983, just three years after DIDMCA's enactment, the FDIC advised state banks that they "may rely on the federal law that incorporates the interest provisions of the state where the bank is located in extending credit to the residents of its state *and of other states,*" including "*when making loans to citizens of states that have rejected the federal preemption*." FDIC Interp. Ltr. No. 83-16, 1983 WL 207393 (Oct. 20, 1983) (emphasis added).

Also in 1983, North Carolina was considering opting-out pursuant to Section 525. The North Carolina Commissioner of Banks was advised by the FDIC's General Counsel of the FDIC's position with respect to the effect of an opt-out:

> The General Counsel of the FDIC has told the Commissioner of Banks' office that, in his opinion, if a State were to override the preemptions of Section 521, a State bank located in another State would still be able to charge North Carolina residents the highest rate allowed in the State bank's home state.[11]

The *Greenwood Trust v. Massachusetts* case in the First Circuit involved exportation of credit card late fees (which are "interest" under Section 521) by Greenwood Trust, a state bank located in Delaware, to its cardholders in Massachusetts. In 1992, the FDIC filed an amicus brief in the First Circuit that argued as follows:

> The fact that a State has countermanded under section 525 should not affect the usury preemption of section 521 for a bank not located in that State, so long as the loan is not made in the State that has countermanded.
>
> Accordingly, *Section 525 clearly does not confer on states that elect to opt out of Section 521 extraterritorial authority to apply their own lending laws to loans made*

---

[11] *See* North Carolina State Banking Comm., Special Mtg. Minutes (Mar. 28, 1983), at p. 10 of 27, https://perma.cc/8M57-U8ER.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

> *in other states by banks chartered in other states, merely because the borrower happens to be a resident.*

FDIC Amicus Brief, *Greenwood Tr. Co. v. Massachusetts*, 1992 WL 12577410, at *35-36 (1st Cir. Feb. 27, 1992) (emphasis added).

**F. <u>Section 1, Subsection 3(b) of House Bill 4116 Also Violates the Dormant Commerce Clause</u>.**

As demonstrated above, Section 1, subsection 3 of House Bill 4116 is preempted by Section 521 of DIDMCA because Oregon's opt-out did not empower it to regulate the interest rates charged on consumer finance loans made by state banks in other states to Oregon borrowers. Subsection 3(b) is constitutionally infirm in yet another respect – it impermissibly seeks to apply the Oregon Consumer Finance Act *in situations where the Oregon resident is not even present in Oregon when the loan is made by the out-of-state state bank.* Indeed, it would apply even if the loan is made by the out-of-state state bank when the borrower is physically present in the bank's state or in another state which authorizes interest rates above Oregon's 36% rate ceiling. This extraterritorial application of Oregon law to conduct entirely outside its borders violates the dormant Commerce Clause.

The Supreme Court has held that "our cases concerning the extraterritorial effects of state economic regulation stand at a minimum for the following proposition[]:…. the Commerce Clause precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Healy v. Beer Instit.*, 491 U.S. 324, 336 (1989) (ellipsis and internal quotation marks omitted); *see also id.* (holding that "a statute that directly controls commerce occurring wholly outside the boundaries of a State exceeds the inherent limits of the enacting State's authority and is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature").



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

The dormant Commerce Clause "is a limitation upon the power of the States" which "prohibits discrimination against interstate commerce and bars state regulations that unduly burden interstate commerce." *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (en banc) (internal quotations omitted). In that case, the en banc Court stated as follows:

> Here, the state statute facially regulates a commercial transaction that 'takes place wholly outside of the State's borders'… Accordingly it violates the dormant Commerce Clause… 'Direct regulation occurs when a state law directly affects transactions that take place… entirely outside of the state's borders. Such a statute is invalid per se.'

*Id.* at 1323-24. *Accord Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 615 (9th Cir. 2018) ("[W]e are faced with an attempt to reach beyond the borders of California and control transactions that occur wholly outside of the State after the material in question—medical waste—has been removed from the State. The mere fact that some nexus to a state exists will not justify regulation of wholly out-of-state transactions.")

In *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010), the Seventh Circuit held that Indiana's Credit Code, which sought to regulate the interest rates on "title loans" made in-person by Illinois lenders in Illinois to Indiana residents who traveled to Illinois to obtain the loans, violated the dormant Commerce Clause. In defending its statute, Indiana "assert[ed] an interest in protecting its residents from what it describes as 'predatory lending.'" *Id.* at 663. It also argued that "the loan proceeds were probably spent largely in Indiana." *Id.* at 669. Nevertheless, the Seventh Circuit applied the *Healy* decision by the Supreme Court and held that the attempted extraterritorial application of Indiana law violated the dormant Commerce Clause. It emphasized that "[t]o allow Indiana to apply its law against title loans when its residents transact in a different state that has a different law would be arbitrarily to exalt the public policy of one state over that of another." *Id.* at 667-68. The same is true here with respect to subsection 3(b).



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Accordingly, Section 1, subsection 3(b) of House Bill 4116 is not only preempted by Section 521 of DIDMCA, it also violates the dormant Commerce Clause to the extent it seeks to apply the Oregon Consumer Finance Act to a loan made by a state bank outside Oregon to an Oregon resident who is also outside Oregon when the loan is made by the bank.

### G. Plaintiffs Are Entitled to a Preliminary Injunction Preventing Enforcement of Section 1, Subsection 3 of House Bill 4116 Against Out-of-State State Banks.

It is well established that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). In *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024), the Court reiterated that it "has adopted the 'serious questions' test – a 'sliding scale' variant of the *Winter* test," under which the first *Winter* factor requires only a demonstration of "serious questions going on the merits." The Court emphasized that "the serious questions standard is a lesser showing than likelihood of success on the merits." *Id.* *Accord Meritage Homeowners' Ass'n v. Bank of N.Y. Mellon*, 2018 U.S. Dist. LEXIS 73229, at *11-12 (D. Or. May 1, 2018) (Aiken, J .).

The "most important" *Winter* factor is likelihood of success on the merits. *United States v. California*, 173 F.4th 1060, 1066 (9th Cir. 2026). Here, there are obviously "serious questions going to the merits," which suffices under the Ninth Circuit's "sliding scale variant of the *Winter* test." *Flathead-Lolo-Bitterroot Citizen Task Force*, 98 F.4th at 1190. As set forth above, Plaintiffs are likely to succeed in establishing that Section 1, subsection 3 of House Bill 4116 is preempted, just as NAIB, AFSA, and its co-plaintiff demonstrated a likelihood of success on the merits in *NAIB v. Weiser*, 737 F.Supp.3d at 1126 ("The plaintiffs have made a strong showing that they are



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

substantially likely to succeed on the merits of their preemption claim. They have pleaded a viable cause of action and their proffered construction of 'loans made in' Colorado is likely to prevail over the State's proposed construction."); *see also id.* at 1133 (same). Also, as shown above, Plaintiffs have demonstrated a likelihood of success on their dormant Commerce Clause claim with respect to the impermissible extraterritorial reach of Section 1, subsection 3(b), which applies Oregon law even if the Oregon borrower is in another state when the loan is made by the out-of-state state bank.

As to irreparable harm, the Ninth Circuit has recently emphasized as follows:

> When 'a plaintiff seeks a preliminary injunction because of an alleged constitutional violation' and "shows [it] is likely to prevail on the merits, that showing will almost always demonstrate [it] is suffering irreparable harm as well.' *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). '[T]he deprivation of constitutional rights,' we have emphasized, 'unquestionably constitutes irreparable injury.' *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) … *see also Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017) (holding that a finding of irreparable harm 'follows inexorably' from a 'conclusion that the government's current policies are likely unconstitutional').

*U.S. v. California*, 173 F.4th at 1069. *Accord Ellis v. City of Corvallis*, 2025 U.S. Dist. LEXIS 5123, at *13-14 (D. Or. Jan. 10, 2025) (Aiken, J.) (same).

As set forth in the accompanying Declarations, Plaintiffs' state bank members who make consumer finance loans to Oregon residents have already incurred costs to comply with House Bill 4116. These members will also (i) lose revenue as a result of lower interest rates; (ii) lose both revenue and goodwill through strained or lost relationships with customers, retailers, and other partners; (iii) lose opportunities for new customer and retailer relationships, including losing customers and retailers to national banks; and (iv) incur ongoing compliance costs.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

In *NAIB v. Weiser*, the court granted the motion for a preliminary injunction against the Colorado opt-out statute filed by NAIB, AFSA, and their co-plaintiff after finding that, absent injunctive relief, they would suffer the same types of irreparable harm that also exist here:

> [T]he plaintiffs have shown that their members will incur administrative costs, lost revenue, and lost customers and goodwill if they must comply with the interest-rate caps in the Colorado UCCC with respect to all loans made to Colorado consumers. While some of those losses may in theory be the sort that are typically compensable with damages, monetary losses in this context are likely not recoverable because a state is generally immune from suit for retrospective monetary relief.... And the plaintiffs have presented evidence that absent an injunction, they will be forced to stop offering their loan products altogether to certain Colorado consumers, and once gone, those customers—and their goodwill along with that of the banks' business partners—may be gone forever. Even if the plaintiffs' members could recover money damages from the State, loss of customers, loss of goodwill, and erosion of a competitive position in the marketplace are the types of intangible damages that may be incalculable, and for which a monetary award cannot be adequate compensation.... The plaintiffs have made a strong showing that their members will suffer irreparable harm if an injunction is not granted.

*NAIB v. Weiser*, 737 F.Supp.3d at 1133-34.

Similarly, the Ninth Circuit has recognized that when a plaintiff suffers damages that cannot be recovered because the defendant is protected by sovereign immunity, the harm is irreparable. *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015) (finding irreparable harm because the plaintiff was unable to recover monetary damages on account of the defendant's sovereign immunity); *Grand River Enters. Six Nations v. Knudsen*, 2024 U.S. App. LEXIS 14597, at *6 (9th Cir. June 14, 2024) (reversing a lower court's denial of a motion for preliminary injunction on the basis that, *inter alia*, the plaintiff was unable to recover monetary damages because of the defendant's sovereign immunity).

In analogous circumstances, this Court entered a preliminary injunction in favor of sixteen States and the District of Columbia and against the United States Department of Health and Human



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Services notwithstanding the argument by HHS that "Plaintiffs have failed to make a sufficient showing of irreparable harm here because the harm to the named Plaintiffs is economic in nature." *Washington v. United States HHS*, 2025 U.S. Dist. LEXIS 211013, at *88 (D. Or. Oct. 27, 2025) (Aiken, J). This Court found that there was irreparable harm:

> Here, if HHS's action is not enjoined, Plaintiff States will lose $35 million. Although economic harm is not normally considered irreparable, such harm is irreparable here because there are no remedies that can compensate for the loss of grant funding.

*Id.* at *88-89.

The last two *Winter* factors weigh the balance of hardships between the parties and the public interest in issuing the injunction. These two factors "merge" where, as here, "the party opposing injunctive relief is a government entity." *U.S. v. California*, 173 F.4th at 1068-69. *Accord Longworth v. Trump*, 2026 U.S. Dist. LEXIS 42029, at *28 (D. Or. March 2, 2026) (Aiken, J).

The Ninth Circuit has held that "[a] plaintiff's likelihood of success on the merits of a constitutional claim also *tips the merged third and fourth factors decisively in his favor*." *U.S. v. California*, 173 F.4th at 1069 (emphasis added). *See also id.* ("plaintiffs who 'establish[] a likelihood that [a] policy violates the U.S. Constitution … have also established that both the public interest and the balance of the equities favor a preliminary injunction."). Thus, Plaintiffs have satisfied the Ninth Circuit's "sliding scale variant of the *Winter* test," as they have shown not only "serious questions going to the merits," but also "a balance of hardships that tips sharply towards the plaintiff." *Flathead-Lolo-Bitterroot Citizen Task Force,* 98 F.4th at 1190.

Since Section 1, subsection 3 of House Bill 4116 is expressly preempted by Section 521 of DIDMCA and thus violates the Supremacy Clause, enjoining its enforcement serves the public



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

interest. *See U.S. v. California*, 173 F. 4th at 1069 ("[P]reventing a violation of the Supremacy Clause serves the public interest"); *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852-53 (9th Cir. 2009) (where there are no adequate remedies to a state violation of federal law, "the interest of preserving the Supremacy Clause is paramount"); *Valle Del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable or in the public's interest to allow the state … to violate the requirements of federal law, especially when there are no adequate remedies available"). *See also Ellis v. City of Corvallis*, 2025 U.S. Dist. LEXIS 5123, at *24 ("it is always in the public interest to prevent the violation of a party's constitutional rights") (Aiken, J).

Also, since the extraterritorial application of Section 1, subsection 3(b) would violate the dormant Commerce Clause, enjoining its enforcement is also in the public interest. *See, e.g., Ass'n for Accessible Meds.*, 562 F.Supp.3d at 989 ("[T]he public interest favors a permanent injunction because Plaintiff has established a likelihood of success on its dormant Commerce Clause claim.").

Conversely, it is well-established that the "enforcement of an unconstitutional law is contrary to the public interest." *Silvester v. Harris*, 2014 U.S. Dist. LEXIS 162771, at *13 (E.D. Cal. Nov. 20, 2014) (citing *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) and *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010)).

The grant of a preliminary injunction will not harm Oregon or its citizens, but rather will simply restore the *status quo ante* that long existed since DIDMCA's enactment over 46 years ago. *See Feldman v. Ariz. Sec'y. of State's Office*, 843 F.3d 366, 369 (9th Cir. 2016) ("Here, the injunction preserves the *status quo* prior to the recent legislative action … [T]he injunction in this case does not involve any disruption to Arizona's long standing election procedures. To the



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

contrary, it restores the *status quo ante* to the disruption created by the Arizona legislature that is affecting this election cycle for the first time.").

With respect to the public interest factor, it also bears emphasis that Oregon consumers, particularly those who are unbanked and have considerable difficulty securing credit, will be harmed if Section 1, subsection 3 of House Bill 4116 is enforced. According to federal data, a substantial number of Oregon households are unbanked or underbanked, and they are disproportionately comprised of people in minority communities.[12]

The ability of out-of-state state banks to offer consumer finance loans at rates above the 36% rate ceiling imposed by the Oregon Consumer Finance Act but that are permitted under the banks' home states' laws and under Section 521 of DIDMCA allows them to provide much-needed credit to low-income consumers who would not otherwise have access to it because their credit profiles would be deemed too risky. Often, being able to charge a higher rate to account for risk of default makes all the difference between being able to offer a loan to borrowers with higher risk profiles and determining that it is too costly and risky to offer them any credit at all.

Plaintiffs' state bank members are highly regulated by the FDIC and their home states. They are committed to responsible and ethical lending, and to enhancing access to credit and consumer choice. But if Section 1, subsection 3 of House Bill 4116 is enforced, Plaintiffs' members will be forced to curtail or forego altogether their consumer finance loans to high-risk Oregon borrowers, thus reducing those borrowers' access to responsible, popular, and useful consumer credit products. Those borrowers, who have long been served through responsible bank-

---

[12] *See* FDIC National Survey of Unbanked and Underbanked Households (2023), https://www.fdic.gov/household-survey/2023-fdic-national-survey-unbanked-and-underbanked-households-appendix-tables at pp. 54, 74.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

fintech partnerships, will now have either no access to credit or be forced to engage with predatory alternatives or national banks whose interest rates are not constrained by Oregon law and who will no longer face competition from state banks with respect to those high risk borrowers.

House Bill 4116 has no effect on national banks, whose interest rate authority is derived from Section 85 of the National Bank Act. By stifling competition from state banks located outside Oregon, Section 1, subsection 3 of House Bill 4116 will simply hand over a larger share of the market for consumer finance loans in Oregon to national banks and give them freer rein to charge higher interest rates allowed by their home states' laws.

In *NAIB v. Weiser*, the court emphasized that the Colorado opt-out had no effect on national banks' ability to charge interest at rates above the Colorado interest rate ceiling. 737 F.Supp.3d at 1134. It pointed out that, "without an injunction, the plaintiffs' member state-chartered banks will be at a disadvantage with respect to national banks, but Colorado consumers will have only marginally more protection from higher interest rates." *Id*. The same is true here as well.

The Declaratory Judgment Act authorizes "any court of the United States" to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201. The court may also grant any "[f]urther necessary or proper relief based on a declaratory judgment," including injunctive relief, "against any adverse party whose rights have been determined by such judgment." *Id.*

*Ex parte Young* provides a limited exception to the Eleventh Amendment. *See generally Ex parte Young*, 209 U.S. 123 (1908). The exception "allows citizens to sue state officers in their official capacities for prospective declaratory or injunctive relief … for their alleged violations of federal law." *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 943



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

(9th Cir. 2013) (quoting *Coal. to Def. Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012)) (internal quotations omitted). Accordingly, this Court has and should exercise its authority to grant the declaratory and injunctive relief that Plaintiffs request.

## V. CONCLUSION

For the reasons set forth above, Plaintiffs respectfully submit that the Court should enter a preliminary injunction preventing Defendant Sean O'Day and his agents and subordinates from enforcing Section 1, subsection 3 of House Bill 4116 with respect to consumer finance loans of $50,000 or less made by out-of-state state banks in their home states.

Dated: July 9, 2026

Respectfully submitted,

BALLARD SPAHR LLP

By: *s/ Pilar C. French*
Pilar C. French, OSB No. 962880
Telephone: 503.778.2100

Burt M. Rublin, *Admitted Pro Hac Vice*
Alan S. Kaplinsky, *pro hac vice forthcoming*
Facundo Bouzat, *Admitted Pro Hac Vice*
Telephone: 215.665.8500

Attorneys for Plaintiffs National Association of Industrial Bankers, Online Lenders Alliance, and American Financial Services Association