Pilar C. French, OSB No. 962880
frenchp@ballardspahr.com
**BALLARD SPAHR LLP**
601 S.W. Second Avenue, Suite 2100
Portland, Oregon 97204
Telephone: 503.778.2100
Facsimile: 503.778.2200

Burt M. Rublin (Admitted *Pro Hac Vice*)
rublin@ballardspahr.com
Alan S. Kaplinsky (Admitted *Pro Hac Vice*)
kaplinsky@ballardspahr.com
Facundo Bouzat (Admitted *Pro Hac Vice*)
bouzatf@ballardspahr.com
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: 215.665.8500
Facsimile: 215.864.8999

Attorneys for Plaintiffs National Association of Industrial Bankers, Online Lenders Alliance, and American Financial Services Association

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

NATIONAL ASSOCIATION OF INDUSTRIAL BANKERS, ONLINE LENDERS ALLIANCE, and AMERICAN FINANCIAL SERVICES ASSOCIATION,

Plaintiffs,

v.

SEAN O'DAY, in his official capacity as Director of Oregon Department of Consumer and Business Services,

Defendant.

Case No. 6:26-cv-01201-AA

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

PAGE


Table of Authorities ..... ii

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 2

A. The Vacated Majority Opinion in *NAIB v. Weiser* Has No Precedential Value ..... 2

B. The Presumption Against Preemption Does Not Apply in This Case ..... 4

C. Under Section 525 of DIDMCA, a Loan is "Made" by the Bank in its State ..... 6

1. The Term "Made" in Sections 521 and 525 Should Be Interpreted the Same Way ..... 7

2. The Phrase "Such State" in Section 525 is Singular ..... 10

3. Defendant's Efforts to Re-Write Section 525 Should Be Rejected ..... 10

4. Numerous Other Federal Banking Statutes Support Plaintiffs' Position That a Loan is "Made" By the Bank, Not the Borrower ..... 13

D. Defendant's Unfounded Statutory Interpretation Is Inconsistent With the Purposes of Sections 521 and 525 of DIDMCA ..... 16

1. Defendant Ignores Section 521's Overriding Purpose to Create Interest Rate Parity Between State and National Banks ..... 16

2. Adoption of Defendant's Position Would Threaten the Dual-Banking System ..... 19

3. Adoption of Defendant's Position Will Not Prevent "Predatory Lending Practices" ..... 20

4. The Purpose of Section 525 Was Not to Empower an Opt-Out State to Regulate Interest Rates Charged by Out-of-State State Banks ..... 21

5. The Earlier Override Provisions in the Brock Bill and Borrowers Relief Act Support Plaintiffs' Position, Not Defendant's ..... 23

6. The House Conference Report Supports Plaintiffs' Position, Not Defendant's ..... 25

7. Oregon Cannot Override Other States' Usury Laws ..... 26

E. Section 1, Subsection 3(b) of House Bill 4116 Also Violates the Dormant Commerce Clause ..... 28

F. Defendant's Argument on Irreparable Harm is Specious ..... 31

G. The Last Two *Winter* Factors Also Support Entry of a Preliminary Injunction ..... 32

H. This Court Should Consolidate the Hearing on the Preliminary Injunction with the Adjudication of the Merits ..... 33

III. CONCLUSION ..... 35




**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ass'n for Accessible Meds. v. Bonta*,
562 F. Supp. 3d 973 (E.D. Cal. 2021)....33

*Assur. Wireless USA, L.P. v. Reynolds*,
100 F.4th 1024 (9th Cir. 2024) ....4, 5

*Bank of Am. v. City & County of San Francisco*,
309 F.3d 551 (9th Cir. 2002) ....5

*CoreCivic, Inc. v. Murphy*,
690 F. Supp. 3d 467 (D.N.J. 2023), *aff'd*, 145 F. 4th 315 (3d Cir. 2025) ....34, 35

*Daniels Sharpsmart, Inc. v. Smith*,
889 F.3d 608 (9th Cir. 2018) ....22, 29

*Durning v. Citibank, N.A.*,
950 F.2d 1419 (9th Cir. 1991) ....2, 3

*Ellis v City of Corvallis*,
2025 U.S. Dist. LEXIS 5123 (D. Or. Jan. 10, 2025) ....31

*FCC v. Pacifica Found.*,
438 U.S. 726 (1978)....12

*Franklin Univ. v. CGFNS Int'l, Inc.*,
534 F. Supp. 3d 457 (E.D. Pa. 2021) ....34

*Garcia v. United States*,
469 U.S.70 (1984)....12

*Gonzalez v. Herrera*,
151 F.4th 1076 (9th Cir. 2025) ....7

*Greater Las Vegas Short-Term Rental Ass'n v. Clark Cnty.*,
799 F. Supp. 3d 1133 (D. Nev. 2025)....32

*Greenwood Tr. Co. v. Commonwealth of Mass.*,
971 F.2d 818 (1st Cir. 1992)....5, 16, 17

*Healy v. Beer Instit.*,
491 U.S. 324 (1989)....22, 29



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

*LA Int'l Corp. v. Prestige Brands Holdings, Inc.*,
168 F.4th 608 (9th Cir. 2026) ....................12

*League of United Latin Am. Citizens v. Wilson*,
131 F.3d 1297 (9th Cir. 1997) ....................3

*Learjet, Inc. v. Oneok, Inc.*,
715 F.3d 716 (9th Cir. 2013) ....................8

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.*,
439 U.S. 299 (1978).................... *passim*

*Midwest Title Loans, Inc. v. Mills*,
593 F.3d 660 (7th Cir. 2010) ....................30

*Miller v. C.H. Robinson Worldwide, Inc.*,
976 F.3d 1016 (9th Cir. 2020) ....................6

*Mills v. Taylor*,
967 F.2d 1397 (9th Cir. 1992) ....................8

*Nat'l Ass'n of Indus. Bankers v. Weiser*,
159 F.4th 694 (10th Cir. 2025), *pet. for rehearing en banc granted, judgment vacated*, 171 F.4th 1203 (10th Cir. 2026).................... *passim*

*Nat'l Ass'n of Indus. Bankers v. Weiser*,
737 F.Supp.3d 1113 (D. Colo. 2024).................... *passim*

*Nat'l Shooting Sports Found. v. Bonta*,
718 F. Supp. 3d 1244 (S.D. Cal. 2024)....................32

*NBD Bank, N.A. v. Bennett*,
67 F.3d 629 (7th Cir. 1995) ....................13

*O'Connor v. Donaldson*,
422 U.S. 563 (1975)....................3

*Penkoski v. Bowser*,
486 F. Supp. 3d 219 (D.D.C. 2020)....................34, 35

*Powers v. McDonough*,
163 F.4th 1162 (9th Cir. 2025) ....................15

*Puerto Rico v. Franklin California Tax-Free Tr.*,
579 U.S. 115 (2016)....................4



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

*Quik Payday*, *Inc. v. Stork*,
549 F.3d 1302 (10th Cir. 2008). ....................29, 30

*Quinn v. Robinson*,
783 F.2d 776 (9th Cir. 1986) ....................3

*R.J. Reynolds Tobacco Co. v. City of L.A.*,
29 F.4th 542 (9th Cir. 2022) ....................4

*Ratzlaf v. United States*,
510 U.S. 135 (1994)....................7

*Roe v. Anderson*,
134 F.3d 1400 (9th Cir. 1998) ....................3

*Scannell Props. #516, LLC v. City of Edwardsville*,
2026 U.S. Dist. LEXIS 102397 (D. Kan. May 8, 2026)....................3, 4

*Sam Francis Found. v. Christies, Inc.*,
784 F.3d 1320 (9th Cir. 2015) (en banc) ....................29

*Save the Peaks Coalition v. United States Forest Serv.*,
669 F.3d 1025 (9th Cir. 2012) ....................3

*Sec'y of Labor v. KC Transp., Inc.*,
173 F.4th 294 (D.C. Cir. 2026)....................10

*Silvester v. Harris*,
2014 U.S. Dist. LEXIS 162771 (E.D. Cal. Nov. 20, 2014)....................33

*Slidewaters LLC v. Wash. State Dep't of Labor & Indus.*,
4 F.4th 747 (9th Cir. 2021) ....................34

*Star Athletica L.L.C. v. Varsity Brands, Inc.*,
580 U.S. 405 (2017)....................9

*United States v. California*,
173 F. 4th 1060 (9th Cir. 2026) ....................31, 32

*United States v. California*,
819 F. Supp. 3d 1109 (C.D. Cal. 2026) ....................32

*United States v. Carrillo-Lopez*,
68 F.4th 1133 (9th Cir. 2023) ....................3

*United States v. Hernandez*,
2000 U.S. App. LEXIS 7530 (10th Cir. April 24, 2000)....................3



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

*United States v. Shirey*,
359 U.S. 255 (1959) ..... 15

*Valle Del Sol, Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) ..... 32, 33

*Wisconsin Central Ltd. v. United States*,
585 U.S. 274 (2018) ..... 12

**Federal Statutes**

12 U.S.C. § 85 ..... *passim*

12 U.S.C. § 1706f(c)(1) ..... 14

12 U.S.C. § 1709-1a(b) ..... 11, 12, 14

12 U.S.C. § 1735f-7 ..... 11, 12, 14

12 U.S.C. § 2202b(a) ..... 14

12 U.S.C. § 2202d(b) ..... 14

12 U.S.C. § 2279aa(7)(C) ..... 13, 14

12 U.S.C. § 4742(10)(A) ..... 14

12 U.S.C. § 5602(b)(1) ..... 14

Borrowers Relief Act of 1979, Pub. L. No. 96-104, 93 Stat. 789 (1979) ..... *passim*

Brock Bill of 1974, Pub.L.No. 93-501, 88 Stat. 1557 (1974) ..... 21, 23, 24

**State Statutes**

Colo. Rev. Stat. Ann. § 5-1-201(2) ..... 29

Oregon Consumer Finance Act ..... 33

Oregon House Bill 4116 ..... *passim*

**Rules**

Fed. R. Civ. P. 65(a)(2) ..... 33, 34



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

**Other Authorities**

125 Cong. Rec. 30655 (Nov. 1, 1979) ............................................................16, 17, 19, 20

2A N. Singer, *Sutherland on Statutory Construction* § 46.05 (5th ed. 1992)................................8

H.R. Rep. No. 96-842, 1980 WL 13128 (March 21, 1980) ..................................................25, 26

S. Rep. No. 96-364 (1979) ..........................................................................................................24

*Usury Lending Limits, Hearing on S. 1988 Before the Comm. on Banking, Hous. & Urb. Affs.*, 96th Cong. (1979) ..................................................................17, 18, 20



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

## I. INTRODUCTION

Defendant's myriad arguments that Section 525 of DIDMCA empowers Oregon to prevent out-of-state state banks from charging interest at the rates allowed by their home states' laws and exporting those rates in the loans they make to Oregon borrowers pursuant to Section 521 of DIDMCA are all unfounded. As demonstrated below, Defendant's brief:

- Relies entirely on a vacated Tenth Circuit majority opinion with no precedential value;
- Relies on a presumption against preemption that is inapplicable here;
- Seeks to give different meanings to the term "made" in Sections 521 and 525, contrary to the doctrine of *in pari materia*;
- Ignores the singular nature of the phrase "such State" in Section 525 by arguing that a loan is "made" in both the lender's and borrower's states;
- Seeks to re-write Section 525 by arguing that it encompasses loans "executed" by the borrower in the opt-out state and loans in which "the borrower is located in the opt-out state" (Def. Br. at 12);
- Ignores the numerous other federal banking statutes evidencing Congress's consistent understanding that a loan is "made" by a bank *to* a borrower, who receives, executes, accepts, or obtains a loan;
- Ignores the Congressional intent underlying Section 521 to create a level playing field between state and national banks with respect to interest rates, which would be eviscerated by adoption of Defendant's position;
- Ignores the amicus curiae briefs filed by the Federal Deposit Insurance Corporation ("FDIC") and Office of the Comptroller of the Currency ("OCC") and the FDIC's longstanding interpretations of Section 525, which support Plaintiffs;



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

- Ignores the fact that the competitive inequality between state and national banks resulting from adoption of Defendant's position would pose a threat to the dual-banking system, whose vitality Section 521 was enacted to preserve;

- Ignores the fact that Oregon's opt-out will not prevent "predatory lending practices" by national banks, who will have freer rein to *increase* interest rates in their loans to high-risk Oregon borrowers if Defendant's position is adopted;

- Ignores the Congressional intent underlying Section 525 to enable an opt-out state to re-assert exclusive interest rate authority over its *own* state banks;

- Relies on the opt-out provision in the Borrowers Relief Act of 1979, which supports Plaintiffs' position, not Defendant's; and

- Ignores controlling Supreme Court and Ninth Circuit precedents demonstrating that Oregon's attempt to regulate extraterritorial loans obtained by Oregonians while they are outside the state violates the dormant Commerce Clause.

## II. ARGUMENT

### A. The Vacated Majority Opinion in *NAIB v. Weiser* Has No Precedential Value

Remarkably, Defendant's arguments with respect to the opt-out issue rely entirely upon the *vacated* majority opinion in *Nat'l Ass'n of Indus. Bankers v. Weiser*, 159 F.4th 694 (10th Cir. 2025), *pet. for rehearing en banc granted, judgment vacated*, 171 F.4th 1203 (10th Cir. 2026). Time and time again throughout his brief, Defendant quotes from and relies upon numerous statements in the majority opinion even though Defendant acknowledges it was vacated when a majority of the active judges on the Tenth Circuit voted to grant rehearing en banc.

Defendant is simply flat-out wrong in asserting that "this Court can still look to vacated decisions … as persuasive authority." (Def. Br. at 8). Quite to the contrary, the Ninth Circuit has repeatedly held that "a decision that has been *vacated* has no precedential authority whatsoever."



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

*Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 n. 2 (9th Cir. 1991) (emphasis in original). The *Durning* decision quoted *O'Connor v. Donaldson*, 422 U.S. 563, 578 n. 12 (1975), which stated that "of necessity our decision vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect…" *Accord League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1305 n. 5 (9th Cir. 1997) (a vacated opinion is "wholly without precedential authority"); *Quinn v. Robinson*, 783 F.2d 776, 799 n. 20 (9th Cir. 1986) (a vacated opinion "has no precedential value").[1]

The Ninth Circuit's decision in *United States v. Carrillo-Lopez*, 68 F.4th 1133, 1142 n. 4 (9th Cir. 2023) is directly on point. It stressed that its prior opinion on the issue involved "*has been vacated* and *scheduled for rehearing en banc … and therefore has no precedential effect.*" *Id*. (emphasis added). *Accord Save the Peaks Coalition v. United States Forest Serv*., 669 F.3d 1025, 1036 (9th Cir. 2012) (a panel decision vacated upon grant of rehearing en banc "has no precedential value"); *United States v. Hernandez*, 2000 U.S. App. LEXIS 7530, at *13 (10th Cir. April 24, 2000) ("Once *Singleton I* was vacated by the court sitting en banc, *Singleton I* was a nullity with no precedential value. In legal effect, it was as though it was never filed.").

Also squarely on point here is *Scannell Props. #516, LLC v. City of Edwardsville*, 2026 U.S. Dist. LEXIS 102397 (D. Kan. May 8, 2026). Just as Defendant has done here, plaintiffs in that case relied on the majority opinion in *Weiser. Id*. at *9-10. The court declared that "Plaintiffs' reliance on *Bankers* is misplaced" because it was vacated upon the Tenth Circuit's grant of

---

[1] Defendant relies on *Roe v. Anderson*, 134 F.3d 1400, 1404 (9th Cir. 1998) (Def. Br. at 8). *Roe* is readily distinguishable because the prior Ninth Circuit decision at issue had been vacated by the Supreme Court as "unripe" since there was no longer a justiciable controversy. *Id*. at 1404. That is very different from the Tenth Circuit's order vacating the majority opinion in *Weiser* because of the grant of rehearing en banc.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

rehearing en banc and thus "no longer has precedential effect … [*W*]*hen a decision is vacated, it must be disregarded and treated as though it never existed.*" *Id.* (emphasis added).

Here, too, Defendant's extensive, indeed sole, reliance on the vacated majority opinion in *Weiser* is obviously "misplaced." *Id*. It also bears emphasis that the written testimony in support of House Bill 4116 by the Department of Consumer and Business Services ("DCBS") and Defendant's amici likewise relied on the majority opinion in *Weiser*, which was vacated *after* the Legislature approved the Bill.[2]

**B. The Presumption Against Preemption Does Not Apply in This Case**

After first mistakenly arguing that this Court should look to the vacated majority opinion in *Weiser* as "persuasive authority," Defendant next argues that "the presumption against preemption applies with full force" in this case. (Def. Br. at 9). Defendant is wrong once again.

Defendant ignores Supreme Court precedent holding that where, as here, "the statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause." *Puerto Rico v. Franklin California Tax-Free Tr*., 579 U.S. 115, 125 (2016). The Ninth Circuit has likewise repeatedly held that "the existence of an express preemption clause negated any presumption against preemption." *R.J. Reynolds Tobacco Co. v. City of L.A*., 29 F.4th 542, 553 n. 6 (9th Cir. 2022). *Accord Assur. Wireless USA,*

---

2

DCBS submission:
https://olis.oregonlegislature.gov/liz/2026R1/Downloads/CommitteeMeetingDocument/315181
at p.7;
DCBS submission:
https://olis.oregonlegislature.gov/liz/2026R1/Downloads/PublicTestimonyDocument/227091
at p.6;
National Consumer Law Center Letter:
https://olis.oregonlegislature.gov/liz/2026R1/Downloads/PublicTestimonyDocument/228206
at p.3.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

*L.P. v. Reynolds*, 100 F.4th 1024, 1032 n. 4 (9th Cir. 2024) (same). Also, in *Bank of Am. v. City & County of San Francisco*, 309 F.3d 551, 559 (9th Cir. 2002), the Ninth Circuit found that ordinances prohibiting banks from charging ATM fees to non-depositors were preempted and it emphasized that "because there has been a 'history of significant federal presence' in national banking, the presumption against preemption of state law is inapplicable."

Given the express preemption provision in Section 521 and "the history of significant federal presence in national banking," there is no presumption against preemption here. Defendant quotes from the First Circuit's landmark decision in *Greenwood Trust*, which acknowledged that Section 521 concerns "two areas which are squarely within the ambit of the states' historic powers-banking … and consumer protection." (Def. Br. at 9, *quoting Greenwood Tr. Co. v. Commonwealth of Mass*., 971 F.2d 818, 828 (1st Cir. 1992)). Significantly, however, Defendant's quotation conveniently *omits the very next two sentences* in *Greenwood Trust*:

> Although this circumstance means that any preemption provision must be construed cautiously and with due regard for state sovereignty … it does not serve as a buckler against the force of the Supremacy Clause. When Congress has acted within its authority and its intent to displace state law is clear – preconditions which obtain here – preemption is not foreclosed by the fact that the federal statute intrudes into the range of subjects over which the states have traditionally exercised their police powers.

*Id.* (citations omitted). The First Circuit held that Section 521 authorized a credit card issuer to export $10 late fees (which are "interest" under Section 521) from Delaware to its Massachusetts cardholders, and preempted a Massachusetts law that prohibited late charges.

Defendant's unfounded argument that a presumption against preemption should be applied here because House Bill 4116 implicates banking and consumer protection issues also disregards *Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299 (1978), the Supreme Court's



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

seminal decision interpreting Section 85 of the National Bank Act, whose language was incorporated in Section 521 of DIDMCA. In *Marquette*, the Court unanimously held that a Nebraska national bank could make credit card loans to Minnesota residents at the 18% interest rate allowed by Nebraska law, and the 12% interest rate limit in Minnesota was preempted by Section 85. In arguing against preemption, Petitioner had contended, just as Defendant does here, that "the 'exportation' of interest rates … will significantly impair the ability of States to enact effective usury laws." *Id.* at 318. Justice Brennan's opinion for the Court acknowledged that "[t]his impairment may in fact be accentuated by the ease with which interstate credit is available by mail through the use of modern credit cards." *Id.* at 318-19. However, "[t]o the extent the enumerated federal rates of interest are greater than permissible state rates, state usury laws must, of course, give way to the federal statute." *Id*. at 318 n.31.

Finally, Defendant cites *Miller v. C.H. Robinson Worldwide, Inc*., 976 F.3d 1016, 1027 (9th Cir. 2020) for the proposition that "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption." (Def. Br. at 9). But that argument is unavailing here because the express preemption clause in Section 521 is not ambiguous. In fact, Defendant does not cite *any* decision rendered since its enactment 46 years ago finding that the preemption clause "is susceptible of more than one plausible reading." *Id.*

### C. Under Section 525 of DIDMCA, a Loan is "Made" by the Bank in its State

In *Nat'l Ass'n of Indus.* Bankers *v. Weiser*, 737 F.Supp.3d 1113 (D. Colo. 2024), en banc appeal pending, No. 24-1293 (10th Cir.), the court correctly held as follows:

> [T]he plain and ordinary answer to the question of *who* 'makes' a loan is the bank, not the borrower. It follows, then, that the answer to the question of *where* a loan is 'made' depends on the location of



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

> the bank, and where the bank takes certain actions, but not on the location of the borrower who 'obtains' or 'receives' the loan.

*Id*. at 1130 (emphasis in original). This conclusion is supported by the plain language of Section 525; the doctrine of *in pari materia*; the colloquial understanding that loans are "made" by banks, not borrowers; the historical context in which DIDMCA was enacted; numerous federal banking statutes providing that a loan is "made" by a bank *to* a borrower; the Congressional intent underlying Sections 521 and 525; and the longstanding interpretation of Section 525 by the federal banking agencies.

**1. The Term "Made" in Sections 521 and 525 Should Be Interpreted The Same Way**

Section 521 authorizes state banks to "charge on any loan or discount *made*" the interest rates allowed by the laws of the state "where the bank is located," while Section 525 uses the phrase "loans *made* in such State." Defendant's brief does not refute Plaintiffs' argument that because the term "made" is used in both Sections 521 and 525, it should be interpreted consistently in both provisions. After all, they were enacted at the same time and address the same subject – namely, the interest rates that can be charged by federally insured state-chartered banks on consumer loans. *See, e.g., Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears"; "reading the word differently for each code section" would "render meaning so malleable" as to "open Pandora's jar."); *Gonzalez v. Herrera*, 151 F.4th 1076, 1086 (9th Cir. 2025) ("Under the doctrine of *in pari materia*, words in different sections of the same statute should be construed similarly.").

Just as Section 521 bases the permissible interest rate on a loan "made" by a state bank on the laws of the state where that bank is located, the very same loan by the very same bank is likewise "made" in that same state for purposes of Section 525.



BALLARD SPAHR LLP
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Rather than reading Sections 521 and 525 harmoniously, Defendant again relies on the vacated majority opinion in *Weiser*, which concluded that, under Section 525, a loan is "made" in the states "in which either the lender *or* the borrower is located." (Def. Br. at 12, *quoting Weiser*, 159 F.4th at 714) (emphasis in original). But there is nothing to support the completely illogical notion that Congress intended that a state bank's interest rate authority under Section 521 with respect to loans "made" by it depends solely on the laws of the bank's state, but its interest rate authority under Section 525 with respect to the same loans "made" by it depends on the laws of both its own state and the borrower's state.

The inconsistent interpretations of "made" in Sections 521 and 525 in the vacated majority opinion in *Weiser* embraced by Defendant is contrary to the doctrine of *in pari materia*. The decision in *Learjet, Inc. v. Oneok, Inc.*, 715 F.3d 716, 731 (9th Cir. 2013) also applies to Defendant's discordant interpretation of "made" in Sections 521 and 525:

> [T]his reading runs afoul of the canon of statutory construction that statutory provisions should not be read in isolation, and the meaning of a statutory provision must be consistent with the structure of the statute of which it is a part … When interpreting statutes … each part or section of a statute should be construed in connection with every other part or section to produce a harmonious whole.

*Accord Mills v. Taylor*, 967 F.2d 1397, 1400 n. 3 (9th Cir. 1992) ("A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent … Thus, it is not proper to confine interpretation to the one section to be construed," *quoting* 2A N. Singer, *Sutherland on Statutory Construction* § 46.05 (5th ed. 1992)).[3]

[3] Similarly, in *Weiser*, the District Court correctly recognized that Section 525 must not be interpreted in a vacuum, but rather in tandem with Section 521: "The textual inquiry, though, is not limited to a specific section in isolation – 'the text of the whole statute gives instruction as to its meaning,' and courts should 'look to the provisions of the whole law' to determine


BALLARD SPAHR LLP
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Again relying on the vacated majority opinion in *Weiser*, Defendant points out that while Section 521 expressly refers to "the State … where the bank is located," Section 525 does not repeat that phrase. (Def. Br. at 11-12, *quoting Weiser*, 159 F.4th at 715-16). But he blithely ignores the fact that *Section 525 does not refer to the state "where the borrower is located" either*. As set forth above, Sections 525 must not be interpreted in isolation but instead should be construed in harmony with Section 521, to which Section 525 expressly refers at the outset: "[t]he amendments made by Sections 521 through 523 of this title." Thus, the two provisions are tied together with one another, and there was no need for Congress to repeat in Section 525 each word or phrase used in Section 521, such as "where the bank is located." Indeed, Section 525 refers just to "loans," while Section 521 refers more expansively to "any loan or discount made, or upon any note, bill of exchange, or other evidence of debt." Under Defendant's flawed reasoning, an opt-out would only apply to "loans" since none of the other instruments referred to in Section 521 was referred to again in Section 525. This surely cannot be the case.

In sum, under the doctrine of *in pari materia*, the state where a loan is "made" for purposes of interest rate preemption under Section 521 (namely, the bank's state) must be the same state where that same loan is "made" for purposes of opting out of Section 521 interest rate preemption under Section 525. Because Section 521 determines permissible interest rates based solely on the bank's location, and Section 525 expressly applies to "[t]he amendments made by section[] 521," the best reading of the phrase "loans made in such State" is that it too means only the state where the bank is located.

---

the meaning of the section at issue." 737 F.Supp.3d at 1128, *quoting Star Athletica L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 414 (2017).



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

**2. <u>The Phrase "Such State" in Section 525 is Singular</u>**

Moreover, Defendant's unfounded argument that a loan is "made" in both the bank's state and the borrower's state cannot be reconciled with the fact that Section 525, like its predecessor, the Borrowers Relief Act, refers to just a *single* state where a loan is made ("loans made in *such State*"). It is well-established that "Congress knows how to be specific." *Sec'y of Labor v. KC Transp., Inc.*, 173 F.4th 294, 309 (D.C. Cir. 2026). If Congress had intended that a loan be deemed "made" in multiple states for purposes of Section 525, it easily could have said so. The singular "State" where a loan is "made" under Section 525 is the same singular "State" where loans are "made" under Section 521 – namely, the State where the bank is located.

**3. <u>Defendant's Efforts to Re-Write Section 525 Should Be Rejected</u>**

It is truly ironic that Defendant claims that "Plaintiffs' reading inserts words into the statute." (Def. Br. at 11). It is *Defendant* who re-writes Section 525 when he contends that "loans made in such State" "can refer to the borrower's location." (*Id*. at 14). Section 525 says no such thing. Defendant also re-writes Section 525 when he asserts that "loans made in such State" refers to multiple states, not just one. (*Id*. at 13).

Yet another instance in which Defendant improperly "inserts words into the statute" (*id*. at 11) is found on page 12 of his brief. There, he again relies on the vacated majority opinion in *Weiser* to argue that "given that 'made' refers to 'executed' and given that 'an executed loan necessarily requires at least two parties – a lender and a borrower,' the phrase 'loans made in such State' encompasses loans in which either the lender *or* the borrower is located in the opt-out state." (Def. Br. at 12, quoting *Weiser*, 159 F.4th at 714) (emphasis in original). Even though the term "executed" is nowhere to be found in Section 525 of DIDMCA, the majority opinion in *Weiser* nevertheless asserted that "'loans made in such State' refers to loans executed in the opt-out state,"



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

and it relied on the very last of four alternative definitions of "made" in Black's Law Dictionary. *Id.* at 714 and n.22.

But Section 525 plainly refers only to the State where a loan is "made," *not* where it is "executed." As discussed in Plaintiffs' prior brief (pp. 16-19) in December 1979, just three months before enacting DIDMCA, the same 96th Congress had enacted a different banking statute preempting state usury laws but allowing states to override preemption as to certain National Housing Act loans "made *or executed*" in such state.[4] This was similar to a different amendment to the National Housing Act three years earlier that likewise allowed states to override federal preemption of state law interest limitations with respect to certain "loans, mortgages, or other interim financing *made or executed* in" such state. 12 U.S.C. § 1709-1a(b) (emphasis added).

Significantly, neither the Defendant's brief nor the vacated majority opinion in *Weiser* upon which he relies even mention these two earlier statutes that used the more expansive phrase "made or executed." Nor does Defendant's brief even address, much less successfully distinguish, the controlling Supreme Court and Ninth Circuit precedents discussed in Plaintiffs' prior brief (pp. 17-18) which demonstrate the significance of Congress's decision to use only the term "made" in Section 525, rather than the much broader "made or executed" phrase used just three months earlier in 12 U.S.C. § 1735f-7 and three years earlier in 12 U.S.C. § 1709-1a(b). As Plaintiffs previously

---

4 *See* 12 U.S.C. § 1735f-7:

> (b) The provisions of subsection (a) shall apply to loans, mortgages, or advances *made or executed* in any State until the effective date (after the date of enactment of this section) of a provision of law of that State limiting the rate or amount of interest, discount points, or other charges on any such loan, mortgage, or advance.

93 Stat. 1114 (emphasis added).



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

noted, the decision in *Wisconsin Central Ltd. v. United States*, 585 U.S. 274, 279 (2018), is squarely on point:

> We usually 'presume differences in language like this convey differences in meaning' … And that presumption must bear particular strength when the same Congress passed both statutes to handle much the same task … Its choice to use the narrower term [in just one of the statutes] requires respect, not disregard.

Here, too, the 96th Congress's "choice to use the narrower term" "made" in Section 525, instead of "made or executed" as it had done just three months earlier in 12 U.S.C. § 1735f-7, "requires respect, not disregard." *Id.* Defendant's argument that Section 525 applies to loans "executed" in the opt-out state by the borrower improperly re-writes the statute. Indeed, Defendant's effort to incorporate the term "executed" in Section 525 flatly contradicts his own assertion that "the Court should apply the statute as written." (Def. Br. at 16).

The *Wisconsin Central* opinion and others like it cited previously by Plaintiffs (pp. 17-18) were simply ignored in Defendant's brief. Defendant also completely ignores the Supreme Court and Ninth Circuit decisions previously cited by Plaintiffs (pp. 18-19) holding that where Congress uses terms "connected in the disjunctive," such as "made or executed" in 12 U.S.C. § 1735f-7 and 12 U.S.C. § 1709-1a(b), this demonstrates Congress's understanding that these terms must "be given separate meanings." *Garcia v. United States*, 469 U.S.70, 73 (1984). *Accord FCC v. Pacifica Found.*, 438 U.S. 726, 739-40 (1978) (same); *LA Int'l Corp. v. Prestige Brands Holdings, Inc.*, 168 F.4th 608, 619 (9th Cir. 2026) (same).

Section 525 uses only the lender-centric term "made," and does not refer to the state where the loan is "executed," "obtained," "accepted," or "received" by the borrower. Defendant has not refuted the persuasive reasoning of the District Court in *Weiser* on this textual issue:



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

> Congress's use of 'made' puts the focus on the act of making a loan. In plain parlance, it is the lender who *makes* a loan; nobody thinks of themselves as 'making a loan' when they borrow money from a family member or put a charge on a credit card. Had Congress sought to put the focus on the borrower, as the State argues, it could have done so in many ways. Most easily, for example, by allowing states to opt out as to loans 'made to borrowers in such State.' Or without even changing the structure of the sentence, Congress could have simply used a borrower-focused word like 'accepted' or 'obtained' 'in such State.' Instead, it put the focus on where a loan is 'made,' which puts the focus on the lender …

737 F.Supp.3d at 1129 (emphasis in original).

#### 4. **Numerous Other Federal Banking Statutes Support Plaintiffs' Position That a Loan is "Made" By the Bank, Not the Borrower**

As demonstrated in Plaintiffs' prior brief (pp. 15-16 and n. 6), there are numerous banking statutes in Title 12 of the United States Code, which governs "Banks and Banking," that clearly evidence Congress's understanding that a loan is "made" by a bank *to* a borrower. This comports with the common sense, colloquial understanding that a loan is made by a bank, not the borrower. It is also supported by the Supreme Court's decision in *Marquette*. The Court noted that "the convenience of modern mail permits Minnesota residents holding Omaha Bank's BankAmericards to receive loans without visiting Nebraska," but stressed that "credit on the use of their cards is nevertheless similarly extended by Omaha Bank *in Nebraska*." 439 U.S. at 311-12 (emphasis added). *Accord NBD Bank, N.A. v. Bennett*, 67 F.3d 629, 632 (7th Cir. 1995) (quoting foregoing statement from *Marquette* and explaining that "[i]n other words, *the Nebraska bank made its loans 'in' Nebraska*") (emphasis added).

Conversely, when banking statutes refer to actions by borrowers concerning loans, they uniformly provide that borrowers *receive* or *obtain* loans, rather than "make" them. *See, e.g.,* 12 U.S.C. § 2279aa(7)(C) ("a loan . . . by a cooperative lender to a *borrower* that has *received* . . . a



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

loan" (emphasis added)); 12 U.S.C. § 4742(10)(A) ("depositing all required premium charges paid ... by each *borrower receiving* a loan" (emphasis added)); 12 U.S.C. § 5602(b)(1) ("protecting *borrowers* with respect to the *obtaining* of ... loans" (emphasis added)); 12 U.S.C. § 1706f(c)(1) ("loan or extension of credit *made to a borrower*" (emphasis added)); 12 U.S.C. § 2202b(a) ("If a Farm Credit Bank forgives . . . any of the principal outstanding on a *loan made to any borrower*" (emphasis added)); 12 U.S.C. § 2202d(b) ("lender may not require any borrower to reduce the outstanding principal balance of any *loan made to the borrower."* (emphasis added)).

Significantly, Defendant does not cite *any* federal banking statute in which the word "made" is used to describe the *borrower's* conduct with respect to a loan. Instead, Defendant once again relies on the vacated majority opinion in *Weiser*, which sought to dismiss the significance of the many statutes in Title 12 that use "made," "make," and "making" solely in reference to the bank's conduct by resorting to strained grammatical arguments. (Def. Br. at 13, quoting *Weiser*, 159 F.4th at 718-19). However, there is nothing to support the *Weiser* majority's view that Congress intended the word "made" in Section 525 to function "as a participial adjective" rather than "as a passive participial verb." *Id* at 713. Indeed, perhaps recognizing the weakness of its grammatical interpretation, the majority then goes on to embellish it by adding the word "executed" to the mix:

> [W]e conclude that 'made in such State' functions as a participial adjective phrase to describe the completed state of the loan – an *executed* loan. So in other words, 'loans made in such State' refers to loans executed in the opt-out state…

*Id*. at 714 (emphasis in original).

As discussed above, Congress knew full well how to say "made or executed," as it previously did in 12 U.S.C. § 1735f-7 and 12 U.S.C. § 1709-1a(b). It chose not to use that more



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

expansive phrase in Section 525. What's more, the *Weiser* majority's strained contention that "'made in such State' functions as a participial adjective phrase" is not supported by legislative history, context, or anything else for that matter. In any event, the Supreme Court has made clear that rules of grammar are not always dispositive in construing a statute. For example, Justice Frankfurter's opinion in *United States v. Shirey*, 359 U.S. 255, 260-61 (1959) stated as follows:

> Statutes … are not inert exercises in literary composition. They are instruments of government, and in construing them 'the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down.'

*See also Powers v. McDonough*, 163 F.4th 1162, 1192 (9th Cir. 2025) (refusing to apply "[t]he rules of grammar" to the interpretation of a statute because doing so would "contradict legislative intent or purpose").

In short, the terms "made" and "make" are used in DIDMCA (including Sections 521 and 525) and throughout Title 12 of the United States Code to refer only to actions by the bank, not the borrower. The *Weiser* majority's novel view that, under Section 525, a loan is "made" in both the bank's and the borrower's locations is completely foreign to any other federal banking statute and violates the doctrine of *in pari materia* because it results in different meanings of "made" in Sections 521 and 525. The term "made" as used in Sections 521 and 525 of DIDMCA (as well as all other federal banking statutes) refers solely to the bank's location. The bottom line is that regardless of whether the term "made" in Section 525 was used as an adjective or verb by Congress, a loan is "made" by a bank in the state where the bank is located, not the state where the loan is executed, received, or obtained by the borrower.[5]

---

[5] Defendant's amici argue that "Section 525's effective-date structure makes Section 521 inapplicable to loans made in the opt-out state." Dkt. No. 40-1 at p. 10. This unfounded argument, which was not advanced by Defendant or the majority opinion in *Weiser*, has it



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

### D. Defendant's Unfounded Statutory Interpretation Is Inconsistent With the Purposes of Sections 521 and 525 of DIDMCA

As demonstrated above, Defendant's position that a loan is "made" in both the bank's state and the borrower's state for purposes of Section 525 finds no support in the plain language of Section 525. That alone should be dispositive here. Defendant's arguments are also contrary to the Congressional intent underlying Sections 521 and 525 of DIDMCA.

#### 1. Defendant Ignores Section 521's Overriding Purpose to Create Interest Rate Parity Between State and National Banks

It is telling that Defendant's cursory discussion of Section 521 (Def. Br. at 3) makes absolutely no mention of the critically important historical context of the statute, its legislative history, or its purpose. As previously discussed in Plaintiffs' opening brief (pp. 10-12) and in *Greenwood Trust,* Section 521 was enacted to eliminate the "insuperable competitive disadvantage" faced by state banks located in states with low usury ceilings. 971 F.2d at 826.

For example, Arkansas had a 10% usury ceiling, and Arkansas state banks constrained by that low ceiling simply could not compete with national banks in Arkansas in making intrastate loans to Arkansas borrowers. That was because the national banks were authorized by Section 85 of the National Bank Act to charge interest at the higher of the 10% Arkansas limit or the alternative federal rate of 1% above the Federal Reserve discount rate, which was then 12%. Senator Pryor of Arkansas was co-sponsor of the bill (S. 1988) that became Section 521 along with fellow Arkansas Senator Bumpers. Senator Pryor described the dire situation confronting Arkansas state banks: "[W]hen the discount rate is higher than the usury limit, the State banks and

---

backwards: "The effective-date context of the opt-out provision also *undermines* the argument that a loan is 'made' in the state or states where the bank and the borrower enter into the loan contract." *Weiser*, 737 F.Supp.3d at 1131 (emphasis added).



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

savings and loans are placed in an impossible grossly unfair situation." 125 Cong. Rec. 30655 (Nov. 1, 1979) (emphasis added). Similarly, Arkansas Governor Bill Clinton stressed that "our State institutions must not be kept at this unwarranted competitive disadvantage." *Usury Lending Limits, Hearing Before the Comm. on Banking, Hous. & Urb. Affs.*, 96th Cong. (1979) ("Usury Lending Limits Hearing"), https://perma.cc/Z9TP-ZT4P at p. 4.

Congress rectified the "impossible grossly unfair situation" by enacting Section 521, whose purpose was recited in the preamble to the statute itself—it was enacted "[i]n order to prevent discrimination against State-chartered insured depository institutions . . . with respect to interest rates." As explained in *Greenwood Trust*, "[t]o achieve this objective" of creating parity between state banks and national banks, "Congress engrafted onto DIDA's bare bones . . . language taken from [Section 85 of] the Bank Act." 971 F.2d at 826. As a consequence, state banks, like national banks, could charge interest at the rates allowed in the state where they were located or the alternative federal rate of 1% above the Federal Reserve discount rate, whichever was higher.

Thus, Arkansas' state banks, like its national banks, could rely on the alternative federal interest rate option to charge 13% interest, and the 10% Arkansas ceiling was preempted. And, like national banks, state banks were empowered by Section 521 and *Marquette* to export the rates allowed by Section 521 in loans they made to borrowers in other states, whose usury ceilings were expressly preempted. *Greenwood Trust*, 971 F.2d at 827.

Also, DIDMCA's legislative history reflects that the benefit conferred on a state's state banks by Section 521 could be declined by a state pursuant to Section 525 if it wanted to re-assert sole interest rate authority over its *own* state banks. "Each State is given a chance to decide whether or not it desires to receive the benefits which this legislation will confer." Usury Lending Limits



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Hearing, https://perma.cc/Z9TP-ZT4P at p. 5. Section 525 was not intended to empower an opt-out state to take away from *other* states the benefits conferred by Section 521.

Defendant ignores the overriding Congressional intent to create interest rate parity between state and national banks. Defendant also utterly fails to address the argument by Plaintiffs and their amici that adoption of Defendant's position would destroy the level playing field Congress intended to create. State banks in other states would no longer be able to make loans to Oregon borrowers at their home states' rates pursuant to Section 521. But competing out-of-state national banks in those same states would remain free under Section 85 to continue to export their home states' interest rates in loans they make to Oregon borrowers. This would re-create the very same "discrimination against State-chartered insured depository institutions" that Congress sought to "prevent," as expressly set forth in the preamble of Section 521.

The amicus curiae briefs filed by the FDIC and OCC both emphasize that Defendant's position squarely conflicts with the overriding parity objective that animated the enactment of Section 521. (FDIC Br. at 10-11; OCC Br. at 2, 9). It is noteworthy that Defendant's brief says *nothing at all* about the FDIC and OCC amicus briefs. Nor does Defendant address FDIC interpretations of Section 525 in the years soon after DIDMCA's enactment that support Plaintiffs' interpretation here. *See* FDIC Br. at 12-13; Pl. Br. at 22-23.[6]

---

[6] The amici brief supporting Defendant quotes a sentence in a 2020 FDIC rulemaking. (Dkt. No. 40-1 at 9.) But as the FDIC amicus brief explains, that sentence is taken out of context, as "it was addressing only loans that had already been deemed 'made' … in the opt-out state." (FDIC Br. at 16).



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Adoption of Defendant's incorrect interpretation of Section 525 would also impermissibly infringe upon the sovereign authority of other states to regulate the interest rates charged by their own state banks. As the FDIC's amicus brief argues:

> Oregon's Section 525 opt-out would not simply restore the interest-rate regime to the one that would apply in the absence of Section 521; it would effectively override other states' decisions *not* to opt-out of Section 521 for banks located in their borders that lend to Oregon borrowers residing or domiciled in the state. This does not respect federalism, it contravenes it.

FDIC Br. at 9 (emphasis added). *Accord* Amici Curiae Brief of Utah and 14 Other States at 2 (Oregon's statute "offends the co-equal sovereignty of sister states and their ability to regulate and ensure the financial health of their own state-chartered financial institutions."); *id.* at 13 ("Constitutional principles protect Amici States' sovereignty from having Oregon's lending laws apply to loans made in Amici States by their own state-chartered banks.").

### 2. Adoption of Defendant's Position Would Threaten the Dual-Banking System

Acceptance of Defendant's argument that out-of-state state banks can no longer rely on Section 521 to export their home state interest rates in loans they make to Oregon borrowers, while national banks can continue to do so pursuant to Section 85, would not only destroy the competitive equality sought by Congress and cause incalculable harm to state banks, it also "threatens to undermine the country's dual-banking system." FDIC Br. at 1. *See also* American Bankers Ass'n, et al. Amicus Br. at 21-22. In fact, during the legislative debate over DIDMCA, Senator Pryor explained that the inability of state banks to charge the same interest rates as the national banks against which they competed posed a significant danger to the dual-banking system:

> This is, strictly speaking, not a "usury" issue but a matter of competitive equality … [W]hen the discount rate is higher than the



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

> usury limit, the State banks and savings and loans are placed in an impossible grossly unfair situation.
>
> * * *
>
> *We have 210 State banks in my State, and every one of them is going to be applying for a federal charter if something is not done*. I personally think the dual [banking] system is a good thing but we in Arkansas cannot keep it unless we get some relief on this thing.

125 Cong. Rec. 30655 (Nov. 1, 1979) (emphasis added). Similarly, Senator Bumpers emphasized the importance of maintaining "the dual banking system," and stated that "if I had a State bank charter and I foresaw the Federal discount rate remaining at 12 percent for another year or two, I would be applying to the Comptroller General immediately for a national bank charter." Usury Lending Limits Hearing, https://perma.cc/Z9TP-ZT4P at p. 43.

The same threat to the dual-banking system that DIDMCA sought to eliminate would arise again if Defendant's position was adopted, as many state banks would surely apply for national bank charters so they could continue to export their home states' interest rates in their interstate loans.

### 3. **<u>Adoption of Defendant's Position Will Not Prevent "Predatory Lending Practices"</u>**

Oregon's opt-out statute will not "protect Oregon borrowers from predatory high-interest lending practices," as mistakenly claimed by Defendant and his amici. (Def. Br. at 1, 7, 22). Instead, adoption of Defendant's position would result in fewer credit options for high-risk Oregon borrowers and less competition for national banks, giving them freer rein to *increase* their interest rates to those borrowers. Thus, Oregon's opt-out "will not be able to prevent national banks from making loans to [Oregonians] at above" Oregon's interest rate limitations. *Weiser*, 737 F.Supp.3d at 1134.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

### 4. The Purpose of Section 525 Was Not to Empower an Opt-Out State to Regulate Interest Rates Charged by Out-of-State State Banks

Defendant's brief not only cavalierly disregards the express Congressional intent set forth in Section 521 to create interest rate parity between state-chartered and national banks, it also mischaracterizes the purpose of Section 525. Contrary to Defendant's repeated assertions, there is *nothing* in the text of Section 525 or its legislative history demonstrating that Congress intended to allow an opt-out state to prevent state banks in *other* states from continuing to utilize their federal interest rate and exportation authority under Section 521 in the interstate loans they make to borrowers in the opt-out state.

Neither Defendant nor his amici have cited *anything* in the legislative history showing that Section 525 was enacted as a consumer protection measure in order to protect an opt-out state's citizens from being charged interest rates higher than allowed under its own state's laws on loans made by state banks located in other states. Defendant does not dispute that there was hardly any interstate lending by state banks before DIDMCA was enacted, because they did not enjoy federal interest exportation powers until its enactment. (Pl. Br. at 20). Also, Defendant has not disputed (nor could he dispute) Plaintiffs' assertion that the legislative history does not reflect *any* Congressional discussion or concern about the interest rates being charged by out-of-state state banks in their very few interstate loans at that time. (*Id.*).

Just as was the case with the earlier Brock Bill and Borrowers Relief Act, there were concerns by some in Congress about the federal government preempting a state's usury laws and empowering its state banks to charge the potentially higher alternative federal rate of 1% above the Federal Reserve discount rate. As explained above, when DIDMCA was enacted, the alternative federal rate was 13%, compared to the 10% usury ceiling in Arkansas and certain other



BALLARD SPAHR LLP
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

states. Congress addressed the concern about federalism by giving states the right to opt-out of Section 521 preemption with respect to their *own* state banks. In other words, under Section 525, states could restore the *status quo ante* by once again restricting their own state banks to their own state usury ceilings, eliminating their option under Section 521 to charge the potentially higher alternative federal rate of 1% above the Federal Reserve discount rate. This is not a "partial" opt-out, as mistakenly and repeatedly claimed by Defendant and his amici. Instead, it constitutes the *full* opt-out authority conferred by Congress under Section 525.

An opt-out does not empower an opt-out state to take away from *other* states their own sovereign right to regulate the interest rates charged by their own state banks in their interstate loans. As the FDIC correctly observed, Defendant's position "does not respect federalism, it contravenes it." FDIC Br. at 9. *Accord* OCC Br. at 2, 9 (Oregon cannot "foist the effects of its opt-out decision onto state banks across the country" and cannot "dictate the interest rate that a state bank outside of Oregon may charge").

Adoption of Defendant's unfounded statutory interpretation would completely subvert the Congressional intent underlying Section 525 by enabling an opt-out state to displace all other states' sovereign powers over their own state banks. This would stand federalism on its head. It is also contrary to well-established dormant Commerce Clause jurisprudence that bars "the projection of one state regulatory regime into the jurisdiction of another State." *Healy v. Beer Instit.*, 491 U.S. 324, 337 (1989). *Accord Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 616 (9th Cir. 2018) (same).



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

### 5. The Earlier Override Provisions in the Brock Bill and Borrowers Relief Act Support Plaintiffs' Position, Not Defendant's

As stated above, Section 525 was not the first time that Congress allowed states to override federal statutory provisions that enabled banks to charge higher interest rates than permitted under their home state's usury laws. Like DIDMCA, the Brock Bill of 1974 and Borrowers Relief Act of 1979 were enacted when inflation and interest rates were sky high. Defendant's discussion of these laws neglects to mention that they applied only to certain business and agricultural loans, *not* consumer loans. They were emergency measures that allowed state and national banks in several states with 10% usury ceilings to charge a higher federal interest rate for a temporary period of time.[7] Moreover, they were focused solely on intrastate lending, not interstate lending or interest rate exportation (indeed, the Brock Bill preceded *Marquette*).

Just as was the case with the Congressional debate over DIDMCA later on, during the earlier debates over the Brock Bill of 1974 and Borrowers Relief Act of 1979, concern was expressed that, by allowing banks in the affected states to charge interest rates several points above the 10% usury ceilings in their home states, these statutes would infringe upon the affected states' sovereign right to regulate the interest rates charged by their *own* states' banks. To address these concerns, each statute had an opt-out provision. The Brock Bill stated that the three affected states could override the higher federally-authorized interest rate before the Bill's sunset date if "the

[7] *See* Brock Bill of 1974, Pub.L.No. 93-501, § 206, 88 Stat. 1557, 1558 (1974) (expired); Borrowers Relief Act of 1979, Pub. L. No. 96-104, 93 Stat. 789, § § 101-02 (1979) (expired). Each statute allowed banks to charge "interest at a rate of not more than 5 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve district where the bank is located." Pub.L. No. 93-501, § 202; Pub.L. No. 96-104, § 102. The Brock Bill applied to Arkansas, Tennessee, and Montana, which then each had a 10% interest rate ceiling for business and agricultural loans. The Borrowers Relief Act applied only to Arkansas. *See* FDIC Br. at 6 and n.3.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

State enacts a provision of law which prohibits the charging of interest at the rates provided in the amendments made by this title." Pub.L. No. 93-501, § 206.

The Borrowers Relief Act reinstated the Brock Bill's then-expired federal interest rate alternative (5% above the discount rate) on business and agricultural loans for national and state banks located in Arkansas.[8] Like the Brock Bill five years earlier, Congress was again mindful of federalism and thus included an opt-out provision stating that the higher federal interest rate alternative could be overridden by Arkansas before the Act's sunset date on "the date … on which such State adopts a law stating in substance that such State does not want the amendments made by this title … *to apply with respect to loans made in such State*." Pub.L. No. 96-104, § 107(2) (emphasis added). This highlighted opt-out language from the Borrowers Relief Act (enacted November 5, 1979) was used again by the same 96th Congress in Section 525 of DIDMCA, which was enacted just four months later on March 31, 1980.

Defendant does not cite *anything* from the legislative history of either the Brock Bill or the Borrowers Relief Act demonstrating that their override provisions quoted above were based on consumer protection concerns – as noted above, neither statute related to consumer loans, but instead just business and agricultural loans. Nor does Defendant cite any legislative history showing that these override provisions were based on concerns over interstate lending, or that they were intended to prevent interest rate exportation by out-of-state state banks. That is because both

---

8 Unlike Tennessee and Montana, Arkansas had not amended the 10% interest-rate ceiling in its Constitution by the time the Brock Bill expired. *See* S. Rep. No. 96-364 at 1-3 (1979). So although the Borrowers Relief Act did not name Arkansas expressly, only Arkansas fit within its ambit: "those States having a constitutional provision which provides that all contracts for a greater rate of interest than 10 per centum per annum shall be void, as to principal and interest." Pub.L. No. 96-104, § 301.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

statutes preceded the conferral of interest exportation powers on state banks through the enactment of Section 521 of DIDMCA, and the Brock Bill preceded *Marquette*.

Also, it bears reiteration that the *only* state covered by the Borrowers Relief Act was Arkansas. Thus, the key phrase in that Act's opt-out provision ("loans made in such State"), which was repeated verbatim just four months later in Section 525, *necessarily referred only to loans made by Arkansas banks in Arkansas*. It could not possibly refer to loans made by out-of-state state banks to Arkansas borrowers, because *banks in other states were not covered by the Act*.

Thus, contrary to Defendant's mistaken assertions (Def. Br. at 15-16), the opt-out provision in the Borrowers Relief Act strongly supports the statutory interpretation of Section 525 by *Plaintiffs*, not Defendant.

**6. The House Conference Report Supports Plaintiffs' Position, Not Defendant's**

Defendant's reliance on H.R. Rep. No. 96-842 (*id*. at 16) is also perplexing, because once again that Report supports Plaintiffs' position. The sentence from the House Conference Report quoted by Defendant does *not* say that an opt-out state can override preemption with respect to interstate loans made by out-of-state state banks. In fact, the Report supports Plaintiffs*'* statutory interpretation because it focuses on the provision in Section 521 authorizing state banks to charge interest at the alternative federal rate of 1% above the Federal Reserve discount rate. It states that "a ceiling of 1 percentage point above the appropriate Federal Reserve discount rate will apply" unless a state overrides preemption. H.R. Rep. No. 96-842, 1980 WL 13128 (March 21, 1980), at *78. It further states as follows:

> Since each of the bill's federal preemptions provides for a separate right of state override, the state's override proposal would be required to refer to the specific preemption, such as that on mortgage loans, on business and agricultural loans over $25,000, *or that which*



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

> *permits federally-insured depository institutions to charge 1 percent over the Federal Reserve's discount rate on any loan.*

*Id*. at *79 (emphasis added).

Notably, the House Conference Report makes absolutely no reference to interstate lending by out-of-state state banks or interest rate exportation by such banks, which is understandable since state banks did not exercise federal interest exportation power prior to the enactment of DIDMCA. The passages from the Report quoted above support Plaintiffs' position that the override provision in Section 525, like the identical override provision in the Borrowers Relief Act four months earlier, was intended only to enable an opt-out state to once again limit its *own* state banks to its own interest rate ceilings, and eliminate their right under Section 521 to charge the potentially higher alternative federal rate of 1% above the Federal Reserve discount rate.

### 7. <u>Oregon Cannot Override Other States' Usury Laws</u>

Defendant claims that Plaintiffs' interpretation of Section 525 means that "every non-opt-out state can override the opt-out state's interest rate laws." (Def. Br. at 15). Not so. Other *states* are *not* overriding Oregon's interest rate laws – instead, those laws were expressly preempted by *Congress* when it enacted Section 521. In fact, Defendant's argument has it completely backwards – it is *Oregon* that is improperly attempting to "override" the interest rate laws of *other* states by preventing state banks in those states from charging and exporting the interest rates permitted by their home state laws and by Section 521. *See* FDIC Br. at 9 (Oregon's opt-out "would effectively override other states' decisions *not* to opt-out of Section 521 for banks located in their borders") (italics in original).

Relying yet again on the vacated majority opinion in *Weiser*, Defendant argues that if Section 525 does not enable the opt-out state to regulate interest rates charged by out-of-state state



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

banks, then "no state would ever opt out" because it "would only disadvantage its own banks." (Def. Br. at 15, *quoting Weiser*, 159 F.4th at 723). But as demonstrated above, neither Defendant, his amici, nor the *Weiser* majority provide any support for their faulty premise that Section 525 was intended to halt rate exportation by out-of-state state banks in interstate loans they make to borrowers in the opt-out state. That was not the purpose of Section 525.

Recognizing the very limited utility of an opt-out, five states that originally opted-out pursuant to Section 525 later repealed their opt-outs. (Pl. Br. at 9 n.3). Only Iowa and Puerto Rico were opted out before Colorado and Oregon's recent improper attempts to utilize their opt-outs as a means of preventing out-of-state state banks from exporting their home state interest rates. (*Id.*). Significantly, Iowa agrees with *Plaintiffs* that Oregon and Colorado's unduly expansive view of their opt-out authority goes too far, as Iowa joined the multistate amicus briefs supporting Plaintiffs in this case and the Tenth Circuit. *See* Dkt. No. 27; *Weiser*, No. 24-1293 at Dkt. No. 204 (10th Cir.). The paucity of opt-outs over the past 46 years reflects the understanding by nearly all states in the country that an opt-out does not accomplish nearly as much as Defendant mistakenly claims it accomplishes – namely, protecting the opt-out state's borrowers from higher interest rates charged by out-of-state state banks. It is no wonder that so few states are opted-out.[9]

In sum, Section 525 only authorizes an opt-out state to decline interest rate parity for its *own* state banks in favor of re-asserting exclusive control over those banks' interest rate caps.

---

[9] It is highly questionable that the Oregon Legislature would have passed House Bill 4116 if it had voted on the Bill *after* the *Weiser* opinion was vacated by the Tenth Circuit, rather than beforehand. As noted above, in urging adoption of the Bill, the DCBS had emphasized that, "[u]nder the Tenth Circuit's ruling, the phrase 'loans made in such State' in DIDMCA's opt-out provision encompasses loans in which <u>either</u> the lender or the borrower is in the state." *See* https://olis.oregonlegislature.gov/liz/2026R1/Downloads/PublicTestimonyDocument/227091 at p.6 (emphasis in original).



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Stated differently, Section 525 restores the *status quo ante* by enabling an opt-out state to prevent its own state banks from lending above their own state's usury ceiling, eliminating the alternative federal rate option of 1% above the discount rate. The Supreme Court stressed in *Marquette* that "the protection of state usury laws is an issue of legislative policy, and any plea to alter §85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court." 439 U.S. at 319. Similarly, Defendant's goal of limiting the interest rates charged to Oregonians by out-of-state state banks can only be achieved by amending Section 525.

### E. Section 1, Subsection 3(b) of House Bill 4116 Also Violates the Dormant Commerce Clause

In addition to being preempted by Section 521, Section 1, subsection 3(b) of House Bill 4116 also violates the dormant Commerce Clause. It impermissibly seeks to apply Oregon's interest rate ceiling even when the Oregon borrower *is not physically present in Oregon when the loan is made*, so long as the borrower makes a payment on the loan by debiting an account at a financial institution or trust company in Oregon, or by using a negotiable instrument drawn on a financial institution or trust company in *any* state. That means Oregon law would apply even if the borrower was physically present in the *bank's state* when the loan was made. Defendant's argument on the opt-out issue is that a loan is "made" in the states where the bank and borrower are located. Thus, even under Defendant's position, a loan is made outside Oregon when both the bank and the borrower are located outside the state.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Section 1, subsection 3(b), whose extraterritorial reach goes much further than Colorado's opt-out statute,[10] constitutes an obvious violation of the dormant Commerce Clause, which "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders." *Healy v. Beer Instit.*, 491 U.S. 324, 336 (1989). *Accord Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323-1324 (9th Cir. 2015) (en banc) ("Here, the state statute facially regulates a commercial transaction that 'takes place wholly outside of the State's borders' … Such a statute is invalid per se."); *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 615 (9th Cir. 2018) (same).

Defendant's flawed and brief discussion of the dormant Commerce Clause issue does not even acknowledge or attempt to distinguish the foregoing controlling decisions by the Supreme Court and Ninth Circuit, which were cited in Plaintiffs' opening brief (pp. 23-24), apparently recognizing that any such effort would be futile. Instead, Defendant relies solely on the Tenth Circuit opinion in *Quik Payday*, *Inc. v. Stork*, 549 F.3d 1302, 1308-9 (10th Cir. 2008). (Def. Br. at 18). But once again, that reliance is completely misplaced, as *Quik Payday* supports *Plaintiffs'* position, not Defendant's.

In *Quik Payday*, the Tenth Circuit upheld the application of a Kansas consumer lending statute to an out-of-state payday lender who solicited borrowers in Kansas and entered into online loan contracts with them via the internet. The Tenth Circuit found that the Kansas statute "does not regulate extraterritorial conduct" because it applied *only* when the prospective Kansas borrowers completed an online loan application form and then an online loan contract *while using*

---

[10] *See* Colo. Rev. Stat. Ann. § 5-1-201(2) ("a consumer credit transaction is not made in this state if a resident of this state enters into the transaction while physically present in another state.").



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

*their computers in Kansas*. 549 F.3d at 1304, 1308-9. The Tenth Circuit emphasized the stipulation by the Kansas regulators that a loan transaction entered into by Kansas borrowers when they were using a computer in Missouri or another state "would not be governed by the Kansas statute." *Id*. at 1308.[11] *See also id*. at 1309 ("solicitations of Kansas residents while they were in Missouri or elsewhere outside Kansas … would not have violated Kansas law.").

Thus, *Quik Payday* supports Plaintiffs' argument that if Oregon borrowers are outside Oregon when they enter into a loan transaction with an out-of-state state bank, Oregon is precluded by the dormant Commerce Clause from regulating that extraterritorial loan transaction. And the mere fact that the borrower in such a transaction is an Oregon citizen or resident does not suffice to avoid application of the dormant Commerce Clause, as made clear in *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010), yet another case directly on point that Defendant does not even address or attempt to distinguish. *See* Pl. Br. at 24.

Defendant's understandable lack of confidence in the strength of his arguments on the dormant Commerce Clause issue is evidenced by his resort to a fallback position that Section 1, subsection 3(b) is "severable from the rest of HB 4116" and "any injunction should be limited to

[11] The Court described that stipulation as follows:

> Their brief in this court further clarified that the borrower's physical location at the time of the solicitation is controlling: it states that "[t]he [KUCCC] regulates the conduct of internet payday lenders who choose to make payday loans with Kansas consumers *while they are in Kansas*." Aplee. Br. at 24 (emphasis added). And referring to Quik Payday's hypothetical "about a Kansas consumer leaving Kansas to acquire a payday loan," *id*. at 25, it declared that "the OSBC would not try to apply the [KUCCC] to loans that occur under th[ose] circumstances," *id*. at 26.

549 F.3d at 1308.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

that subsection." (Def. Br. at 24). *See also id*. at 19 (same). The provisions of Section 1, subsection 3(b) of House Bill 4116 impermissibly seek to apply Oregon law to wholly extraterritorial loan transactions, violating the dormant Commerce Clause.

### F. Defendant's Argument on Irreparable Harm is Specious

Defendant argues that Plaintiffs' members will not suffer irreparable harm in the absence of a preliminary injunction because it would supposedly take DCBS a number of months to investigate and then bring an enforcement action with respect to any violation of House Bill 4116. (Def. Br. at 19-21). This specious argument, which is not accompanied by *any* caselaw support, should be rejected out of hand for several reasons.

First, Defendant simply ignores the uncontradicted Declarations submitted with Plaintiffs' motion, which establish that since House Bill 4116 became effective on June 5, 2026, Plaintiffs' members have been losing substantial revenue and incurring compliance costs that cannot be recovered from the State because of sovereign immunity; are experiencing damage to goodwill; and are losing customers and opportunities to make loans to new customers. *See* Pl. Br. at 4, 26-27 and supporting Declarations (ECF Nos. 16-20); *Weiser*, 737 F. Supp. 3d at 1133-34 (setting forth irreparable harm suffered by plaintiffs' members).

Second, Defendant also ignores the Ninth Circuit precedents cited in Plaintiffs' opening brief (pp. 4, 26) repeatedly holding that "[w]hen 'a plaintiff seeks a preliminary injunction because of an alleged constitutional violation' and 'shows [it] is likely to prevail on the merits, that showing will almost always demonstrate [it] is suffering irreparable harm as well.'" *United States v. California*, 173 F. 4th 1060, 1069 (9th Cir. 2026) (citations omitted). *Accord Ellis v City of Corvallis*, 2025 U.S. Dist. LEXIS 5123, at *13-14 (D. Or. Jan. 10, 2025) (Aiken, J.) (same).



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

Finally, Defendant's claim that DCBS personnel take a very long time to conduct investigations and bring enforcement actions serves only to demonstrate that preliminary injunctive relief is needed sooner rather than later, as the irreparable harm continues to mount with every passing week and month that Plaintiffs' members are required to comply with the constitutionally infirm statute.

Also, it is not uncommon for a plaintiff to obtain a preliminary injunction against enforcement of an unconstitutional statute many months before its effective date, which further demonstrates that Defendant's argument is completely unfounded. *See Nat'l Shooting Sports Found. v. Bonta*, 718 F. Supp. 3d 1244, 1249, 1256 (S.D. Cal. 2024) (holding in pre-enforcement context, "[b]efore any member [of the plaintiff trade association] could be sued," that plaintiff demonstrated irreparable harm where the challenged state gun ban "likely runs afoul of the dormant Commerce Clause"); *Greater Las Vegas Short-Term Rental Ass'n v. Clark Cnty*., 799 F. Supp. 3d 1133, 1143 (D. Nev. 2025) (holding plaintiffs established irreparable harm in pre-enforcement challenge to ordinance where "enforcement has already been postponed for a considerable length of time"); *United States v. California*, 819 F. Supp. 3d 1109, 1134 (C.D. Cal. 2026) (holding "that [a state law that] likely violates the Supremacy Clause is … sufficient to establish that enforcement of that provision would amount to irreparable harm" notwithstanding the lack of any actual enforcement of the state law).

**G. The Last Two *Winter* Factors Also Support Entry of a Preliminary Injunction**

Plaintiffs' "likelihood of success on the merits of [their] constitutional claim also tips the merged third and fourth [*Winter*] factors decisively in [their] favor." *U.S. v. California*, 173 F. 4th at 1069. As shown in Plaintiffs' prior brief (pp. 28-29), the Ninth Circuit has repeatedly recognized that "preventing a violation of the Supremacy Clause serves the public interest." *Id. Accord Valle*



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

*Del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (same). Similarly, the public interest favors injunctive relief where, as here, "Plaintiff has established a likelihood of success on its dormant Commerce Clause claim." *Ass'n for Accessible Meds. v. Bonta*, 562 F. Supp. 3d 973, 989 (E.D. Cal. 2021). Conversely, "enforcement of an unconstitutional law is contrary to the public interest." *Silvester v. Harris*, 2014 U.S. Dist. LEXIS 162771, at *13 (E.D. Cal. Nov. 20, 2014).

Defendant's brief does not address the foregoing cases. Nor does Defendant address Plaintiffs' argument that the grant of a preliminary injunction would not harm Oregonians because it would simply restore the *status quo ante* that existed for 46 years after DIDMCA's enactment.[12] Also, as discussed above, since House Bill 4116 does not affect national banks' exportation power under Section 85 of the National Bank Act, the public interest in "protect[ing] Oregon borrowers from predatory high-interest lending practices" (Def. Br. at 1, 7, 22) will not be advanced by denial of the preliminary injunction.

### H. This Court Should Consolidate the Hearing on the Preliminary Injunction with the Adjudication of the Merits

This Court should exercise its broad discretion under Fed. R. Civ. P. 65(a)(2) to consolidate the hearing on the preliminary injunction with the adjudication of the merits. Consolidation is warranted because: (a) the disputed issues of statutory interpretation are purely legal, not factual; (b) only injunctive relief is sought, not money damages; and (c) the interests of judicial economy

---

12 That *status quo ante* included DCBS's vigorous enforcement of the 36% interest rate ceiling in the Consumer Finance Act. One such enforcement action several months prior to the enactment of House Bill 4116 resulted in a cease-and-desist order requiring a licensee to repay $900,000 in excessive interest charges to Oregon borrowers as well as fines totaling $660,000. DCBS Press Release, Jan. 29, 2026, https://dfr.oregon.gov/news/news2026/Pages/20260129-loanmart-to-repay-oregon-borrowers.aspx.



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

and efficiency would best be served by treating the parties' preliminary injunction briefs as cross-motions for summary judgment, thus avoiding duplicative briefing.

The Ninth Circuit's decision in *Slidewaters LLC v. Wash. State Dep't of Labor & Indus.*, 4 F.4th 747, 759-60 (9th Cir. 2021) is instructive here. That case involved a water park's motion for a preliminary injunction challenging Washington's pandemic-related restrictions on its operations as violative of Washington law and its federal constitutional rights. The Court held that the trial court did not abuse its discretion in ordering consolidation under Rule 65(a)(2), using words that are equally applicable here:

> Slidewaters has not identified any discovery that might have mattered, and we do not perceive any ourselves. The issues raised by the complaint were legal. The central challenge was to Defendant's authority under Washington law. Resolving that challenge did not require additional factual development.

*Id.* at 760. *Accord Franklin Univ. v. CGFNS Int'l, Inc.*, 534 F. Supp. 3d 457, 458 (E.D. Pa. 2021) (holding a consolidated hearing pursuant to Rule 65(a)(2) was appropriate because the issues involved "a matter of statutory interpretation of which the material facts are not in dispute, and therefore no evidentiary hearing was required"); *CoreCivic, Inc. v. Murphy*, 690 F. Supp. 3d 467, 477 (D.N.J. 2023) (consolidation was warranted because "the sole question presented is legal: whether AB 5207 as applied to Plaintiff survives Supremacy Clause scrutiny"), *aff'd*, 145 F. 4th 315 (3d Cir. 2025).

Significantly, just as in *Slidewaters*, Defendant does not claim there are *any* disputed facts or that discovery is necessary. To the contrary, Defendant concedes a trial is unnecessary and this case can be decided through summary judgment motions. (Def. Br. at 26). Thus, consolidation will avoid duplicative briefing of the identical legal issues now and yet again on summary judgment. *See*, *e.g.*, *Penkoski v. Bowser*, 486 F. Supp. 3d 219, 226 (D.D.C. 2020) ("Having granted



**BALLARD SPAHR LLP**
601 S.W. SECOND AVENUE, SUITE 2100
PORTLAND, OREGON 97204
503.778.2100 FAX: 503.778.2200

consolidation under Rule 65(a)(2), the Court treats the parties' briefing as cross-motions for summary judgment."); *CoreCivic*, 690 F. Supp. 3d at 477 ("the Court will construe the parties' briefing on Plaintiff's preliminary injunction motion as cross-motions for summary judgment").

## III. CONCLUSION

For the reasons set forth above and in Plaintiffs' prior brief, the Court should grant Plaintiffs' Motion for a Preliminary Injunction.

Dated: September 8, 2026

Respectfully submitted,

BALLARD SPAHR LLP

By: /s/ Pilar C. French
Pilar C. French, OSB No. 962880
Telephone Number: 503.778.2100

Burt M. Rublin, *Admitted Pro Hac Vice*
Alan S. Kaplinsky, *Admitted Pro Hac Vice*
Facundo Bouzat, *Admitted Pro Hac Vice*
Telephone Number: 215.665.8500

Attorneys for Plaintiffs National Association of Industrial Bankers, Online Lenders Alliance, and American Financial Services Association